Exhibit 1

# Exhibit 1

MICHAEL K. JEANES, CLERK
RECEIVED CCS
DOCUMENT DEPOSITORY

**2017 OCT 12  PM 4: 20**

FILED BY A. S. ROMERO

Christopher A. LaVoy (016609)


**TIFFANY & BOSCO**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-4237
TELEPHONE: (602) 255-6000
FACSIMILE: (602) 255-0103
E-MAIL: cal@tblaw.com
*Attorneys for plaintiff*

**ORIGINAL**

### SUPERIOR COURT OF ARIZONA

### MARICOPA COUNTY

MPB Collection, LLC,

                    Plaintiff,

v.

Everest National Insurance Company,

                    Defendant.

Case No.:  CV 2017-013705

**SUMMONS**
If you would like legal advice from a lawyer,
contact the Lawyer Referral Service at
602-257-4434
or
www.maricopalawyers.org
Sponsored by the
Maricopa County Bar Association

### THE STATE OF ARIZONA TO THE FOLLOWING DEFENDANT:

### Everest National Insurance Company

**YOU ARE HEREBY SUMMONED** and required to appear and defend, within the time applicable, to this action in this Court. If served within Arizona, you shall appear and defend within 20 days after the service of the Summons and Complaint upon you, exclusive of the date of service. If served out of the State of Arizona, whether by direct service, by registered or certified mail, or by publication, you shall appear and defend within 30 days after the service of the Summons and Complaint upon you is complete, exclusive of the date of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of 40 days after date of such service upon the Director. Service by registered or certified mail without the

1

1   State of Arizona is complete 30 days after the date of filing the receipt and affidavit of

2   service with the court.  Service by publication is complete 30 days after the date of first

3   publication.  Direct service is complete when made.  Service upon the Arizona Motor

4   Vehicle Superintendent is complete 30 days after filing the Affidavit of Compliance and

5   return receipt or Officer's Return.  Ariz. R. Civ. P. 4; A.R.S. §§ 20-222, 28-502 and 28-

6   503.

7         **YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend

8   within the time applicable, judgment by default may be rendered against you for the relief

9   demanded in the Complaint.

10        **YOU ARE HEREBY NOTIFIED** that requests for reasonable accommodation for

11  persons with disabilities must be made to the division assigned to the case by parties at

12  least 3 judicial days in advance of a scheduled court proceeding.

13        **YOU ARE CAUTIONED** that in order to appear and defend, you must file an

14  Answer or proper response in writing with the Clerk of this Court, accompanied by the

15  necessary filing fee, within the time required, and you are required to serve a copy of any

16  Answer or response upon the Plaintiff's attorney.  Ariz. R. Civ. P. 5, 10(D); A.R.S. § 12-

17  311.

18              The name and address of Plaintiff's attorney is:

19                          Christopher A. LaVoy
                            TIFFANY & BOSCO, P.A.
20                          Seventh Floor Camelback Esplanade II
                            2525 East Camelback Road
21                          Phoenix, Arizona 85016-4237

22        **SIGNED AND SEALED** this date: ___OCT 1 0 2017_____

23  MICHAEL K. JEANES, CLERK MARICOPA COUNTY SUPERIOR COURT

24

25                          By_____
                                    Deputy Clerk
26                                  J. Lewis
                                    Deputy Clerk

                                    2

Christopher A. LaVoy (016609)

**TIFFANY & BOSCO**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016B4237
TELEPHONE: (602) 255-6000
FACSIMILE:  (602) 255-0103
E-MAIL: cal@tblaw.com

*Attorneys for plaintiff*

MICHAEL K. JEANES
Clerk of the Superior Court
By Joan Lewis, Deputy
Date 10/10/2017 Time 15:37:52
Description                  Amount
------- CASE# CV2017-013705 --------
CIVIL NEW COMPLAINT          322.00
-----------------------------------
TOTAL AMOUNT                 322.00
         Receipt# 26203140

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

MPB Collection, LLC,

                         Plaintiff,

v.

Everest National Insurance Company,

                         Defendant.

Case No.:  CV 2017-013705

**COMPLAINT**

For its complaint, plaintiff alleges as follows:

### THE PARTIES, JURISDICTION AND VENUE

1.      Plaintiff MPB Collection, LLC ("MPB") is an Arizona limited liability company. MPB's sole member and manager is Metro Phoenix Bank, Inc. (the "Bank"). The Bank is an Arizona corporation with its principal place of business in Phoenix, Arizona. The Bank has assigned all rights and interest in the subject insurance claim to MPB for collection.

2.      Defendant Everest National Insurance Company ("Everest") is, upon information and belief, a Delaware corporation domiciled in that state.

3.      This Court has subject matter jurisdiction because the amount demanded exceeds $1,000. *See* Ariz. Const., art. 6 § 14.

1

4.      Venue is proper in Maricopa County because the events underlying this suit occurred within the county. *See* A.R.S. § 12-401(7).

## FACTUAL BACKGROUND

### *GMEA's Loan Fraud*

5.      The Bank made an approximate $3.6 million SBA loan to Global Medical Equipment of America ("GMEA") in mid-2012 (the "Loan").

6.      The purpose of the Loan was to fund GMEA's purchase of two companies— A & A Medical Supply Company ("A & A") and JCare Home Medical Supplies, Inc. ("JCare")—by stock purchase, as well as to pay off an existing SBA loan that GMEA had through another bank.

7.      GMEA had entered into separate stock purchase agreements with Michael Trakhtman for the A & A stock and with Debra Sloan for the JCare stock.

8.      Both the stock-purchase transactions and the Loan closed on or about June 28, 2012, which is when the Bank funded the Loan.

9.      Approximately one year later, in July 2013, GMEA defaulted on the Loan by failing to make required payments.

10.     In December 2013, the Bank sued GMEA in the Superior Court of Arizona, Maricopa County, Case No. CV2013-016955.

11.     The Bank applied for the appointment of a receiver over GMEA, which the Court granted in early 2014.

12.     In the course of investigating GMEA's financial affairs, the receiver discovered evidence suggesting that GMEA obtained the Loan through fraud. This prompted further discovery confirming that GMEA had defrauded the Bank by *inter alia*:

- Overstating the purchase prices of A & A and JCare to obtain a larger loan so that GMEA's principals could pocket the extra money;

2

- Misrepresenting that GMEA was paying $480,000 of its own money towards the purchase of A & A and JCare;
- Misrepresenting that GMEA was purchasing 100% of A & A's shares when it was only purchasing 90%;
- Misrepresenting the share-ownership percentages of GMEA's owners; and
- Forging signatures on Loan documents.

13.    The forged Loan documents included Standby Creditor's Agreements purportedly signed by Trakhtman and Sloan, the sellers of the A & A and JCare stock respectively.

14.    A Standby Creditor's Agreement is an SBA loan document used to restrict the borrower's ability to pay other creditors while repaying the SBA loan. It conserves the borrower's cash flow for the benefit of the lender. The "Standby Borrower" is the SBA borrower and the "Standby Creditor" is the borrower's other creditor (not the lender).

15.    As a condition of making the Loan, the Bank required that both Trakhtman and Sloan execute a Standby Creditor's Agreement prohibiting them from accepting additional stock-purchase payments from GMEA prior to June 29, 2016. This would make them Standby Creditors. In the event GMEA made additional payments to them prior to such date, Trakhtman and Sloan were obligated under the Standby Creditor's Agreements to "turn over" such payments to the Bank.

16.    Trakhtman's and Sloan's signatures on the Standby Creditor's Agreements were forged.

17.    True and correct copies of the forged Standby Creditor's Agreements for Trakhtman and Sloan are attached as Exhibits 1 and 2 respectively.

18.    Upon information and belief, GMEA made additional stock-purchase payments to Trakhtman and Sloan prior to June 29, 2016 in violation of the Standby

3

1 Creditor's Agreements, which Trakhtman and Sloan received and did not turn over to the

2 Bank.

3      19.    While the Bank discovered the basic outline of GMEA's fraud in early

4 2014, it did not discover that Trakhtman's and Sloan's signatures on the Standby

5 Creditor's Agreements were forged until early 2016.

6 *The Bank's Insurance Claim*

7      20.    Everest issued Financial Institution Bond, Bond No. 8100008898-131, to

8 the Bank for the bond period May 22, 2013 through May 22, 2014, which was amended to

9 terminate on October 24, 2014 (the "2013/2014 Bond").

10      21.    Everest issued Financial Institution Bond, Bond No. 8100008898-141, to

11 the Bank for the bond period October 24, 2014 through October 24, 2017 (the "2014/2017

12 Bond").

13      22.    On March 1, 2016, the Bank submitted a claim to Everest to recover the

14 Loan loss under Insuring Agreement (E) of the bonds (the "Insurance Claim").

15      23.    Insuring Agreement (E) generally covers loss resulting directly from the

16 Bank's reliance on certain types of forged or counterfeit documents in making a loan. The

17 covered document types are:

18         (a) Certificated Security,

19         (b) Document of Title,

20         (c) deed, mortgage or other instrument conveying title to, or creating or
            discharging a lien upon, real property,

21         (d) Certificate of Origin or Title,

22         (e) Certificate of Deposit,

23         (f) Evidence of Debt,

24         (g) corporate, partnership or personal Guarantee, or

25         (h) Security Agreement

26

4

24.     The forged Standby Creditor's Agreements qualify as a "Security Agreement" under Insuring Agreement (E). The bonds define a "Security Agreement" as "a Written agreement which creates an interest in personal property . . . which secures payment . . . of an obligation." GMEA's payments to Trakhtman and Sloan were their "personal property." The Standby Creditor's Agreements (assuming they had been signed) granted the Bank an "interest" in those payments, specifically a turn-over right. An "interest" is simply a legal right in property—the Bank's right to have the payments turned over to it constituted an "interest" in those payments that was security for the Loan. The Standby Creditor's Agreements thus meet the definition of a "Security Agreement."

25.     If the turn-over right does not create an "interest" in the payments, it at least creates an obligation by Trakhtman and Sloan (assuming they had signed) to pay the Bank an amount equal to the payments they received towards GMEA's debt to the Bank. This meets the definition of a "Guarantee," which is a covered instrument under Insuring Agreement (E). The bonds define "Guarantee" as "a Written undertaking obligating the signer to pay the debt of another, to the Insured . . . , if the debt is not paid in accordance with its terms." GMEA violated the Loan documents when it paid Trakhtman and Sloan prior to January 29, 2016, triggering an obligation by them to pay an amount equal to the payments to the Bank towards GMEA's debt, which amounts to a "Guarantee." Put differently, had they signed, Trakhtman and Sloan would have agreed to answer for the debt of another to the extent of the payments. A "Guarantee" does not have to be for the entirety of a debt, but can be for part of it, as here.

26.     The Bank extended credit on the faith of and relied on the Standby Creditor's Agreements.

27.     The Bank would not have made the Loan without Standby Creditor's Agreements signed by Trahktman and Sloan.

5

1     28.    The Bank had actual physical possession of a "Written, Original" of each of

2  the Standby Creditor's Agreements before funding the Loan.

3     29.    Trahktman's and Sloan's signatures on the Standby Creditor's Agreements

4  were forged.

5     30.    Trahktman's and Sloan's signatures were material to the validity or

6  enforceability of the Standby Creditor's Agreements.

7     31.    The forging of the Standby Creditor's Agreements caused the Loan loss

8  because the Bank relied on the authenticity of the documents in disbursing funds and

9  prevented the Bank from recovering GMEA's payments to Trahktman and Sloan.

10     32.    The Bank's Loan loss exceeds the bonds' $2 million limit of liability.

11     33.    The bonds state that the Bank shall give notice of the loss within 30 days

12  after discovery. Discovery occurs when an Executive Officer first becomes aware of facts

13  which would cause a reasonable person to assume that a loss of a type covered by the

14  bond has been or will be incurred.

15     34.    The relevant discovery date is not when the Bank discovered the fraud

16  generally, but when an Executive Officer discovered the *covered* portion of the fraud, *i.e.*,

17  when the Executive Officer developed actual or constructive knowledge that Trahktman's

18  and Sloan's signatures on the Standby Creditor's Agreements were forged.

19     35.    The Bank did not discover such signatures were forged until early 2016,

20  within 30 days prior to the Bank giving notice to Everest.

21     36.    To the extent the Bank did not give timely notice, the notice-prejudice rule

22  applies and Everest suffered no prejudice from the delay.

23     37.    The Standby Creditor's Agreements otherwise satisfies all conditions and

24  requirements for coverage under Insuring Agreement (E).

25     38.    Everest denied coverage for the Standby Creditor's Agreements.

26

39.     True and correct copies of Everest's denial letters are attached as Exhibits 3 and 4.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)

40.     Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

41.     Everest breached one or both of the bonds by denying coverage for the Loan loss under Insuring Agreement (E) based on the forged Standby Creditor's Agreements.

42.     The Bank suffered damages from such breach, specifically the balance due on the Loan which exceeds the bonds' limit of liability.

43.     MPB is entitled to recovery on the Bank's behalf pursuant to the Bank's assignment of the Insurance Claim to MPB.

### DEMAND FOR JURY TRIAL

44.     MPB requests a trial by jury of all issues so triable.

### REQUEST FOR AWARD OF ATTORNEYS' FEES

45.     MPB requests an award of its reasonable attorneys' fees incurred in this action pursuant to A.R.S. § 12-341.01. The contracts out of which this action arises are the Bonds.

WHEREFORE, MPB prays for judgment against Everest as follows:

A.      For an award of compensatory, consequential, special, and all other damages and restitution needed to make it whole;

B.      For an award of its costs and attorneys' fees incurred in this action;

C.      For an award of pre-judgment and post-judgment interest; and

D.      For such other and further relief as needed to provide a complete remedy.

. . .

. . .

7

1    DATED this 10th day of October, 2017.

2                                   TIFFANY & BOSCO, P.A.

3

4                              By: _____
                                    Christopher A. LaVoy
5                                   Seventh Floor Camelback Esplanade II
                                    2525 East Camelback Road
6                                   Phoenix, Arizona 85016
7                                   *Attorneys for plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

8

# Exhibit 1

# STANDBY CREDITOR'S AGREEMENT

| SBA Loan # | 52693950-09 |
|---|---|
| SBA Loan Name | Global Medical Equipment of America, Inc. |
| Standby Creditor | Debra Sloan |
| Standby Borrower | Global Medical Equipment of America, Inc. |
| Lender | Metro Phoenix Bank |

Global Medical Equipment of America, Inc. (Standby Borrower) owes $325,000.00 principal and interest to Debra Sloan (Standby Creditor) as of the date of this Agreement (Standby Loan) (Copy of Standby Note attached). To induce Metro Phoenix Bank (Lender) to make an SBA guaranteed loan to Standby Borrower, Loan Number 52693950-09 in the amount of $3,631,000.00 (Lender's Loan), Standby Creditor agrees: *(Check only one box)*

1.  ☐ To accept no further payments on the Standby Loan until Lender's Loan is satisfied.

    ☐ To accept interest only payments at a rate of _____ % per annum (no principal payments) on the Standby Loan until Lender's Loan is satisfied or until notified by Lender to stop accepting payments.

    ☐ To accept payments of principal and interest at the rate of _____ % per annum on the Standby Loan unless notified by Lender to stop accepting payments.

    ☒ To accept payments of principal and interest at the rate of 5.00% per annum beginning on June 29, 2016.

2.  To turn over to Lender payments received by Standby Creditor from Standby Borrower in violation of this Agreement within 15 days of receipt.

3.  That the Standby Debt is and shall be subordinate to Lender's Loan, and all other present and future indebtedness, obligations, liabilities, claims, rights and demands of any kind which may be now or hereafter guaranteed by or owing from Borrower to Lender.

4.  To take no action to enforce claims against Standby Borrower on the Standby Loan until Lender's Loan is satisfied and paid in full.

5.  Any and all liens and security interests of Standby Creditor in the now existing or hereafter acquired real

property and/or personal property of Borrower (collectively, the "Collateral") shall be and hereby are subordinated for all purposes and in all respects to the liens and security interests of Lender in the Collateral, regardless of the time, manner or order of perfection of any such liens and security interests and regardless of any failure, whether intervening or continuing, of Lender's liens to be perfected liens.

6.    To take no action against Standby Borrower's collateral, or any other collateral securing the Standby Loan, without written consent from the Lender, until Lender's Loan is satisfied and paid in full.

7.    Lender, in its sole discretion, may take any action without affecting this Agreement, including but not limited to the following:
   a. Modify the terms of Lender's Loan.
   b. Grant an extension or renewal of Lender's Loan.
   c. Defer payments or enter into a workout agreement on Lender's Loan.
   d. Release or substitute collateral securing Lender's Loan.
   e. Forbear from collecting on existing collateral or requiring additional collateral.
   f. Declare a default on Lender's Loan and notify Standby Creditor to stop accepting payments.
   g. Agree to release, compromise, or settlement of Lender's Loan.

8.    This Agreement applies to any successor to the Standby Creditor or assignee of this Agreement or of the Standby Note, including any bankruptcy trustee or receiver or guarantors or sureties of the Standby Note.

9.    Additional Loans made by Standby Creditor will be subject to the terms of this Agreement, unless Lender agrees otherwise in writing.

Dated: _____6/28_____, 2012

Standby Creditor:

Debra Sloan, Individually

METROPHX-002890

**EXHIBIT A**

STANDBY NOTE
(See Attached)

METROPHX-002891

## PROMISSORY NOTE

**$325,000.00**                                                                                    **March 31, 2012**

FOR VALUE RECEIVED, the undersigned, Global Medical Equipment of America, of 23025 N. 15th Avenue, Unit 106, Phoenix, AZ 85027 promises to pay to the order of Debra Sloan ("Holder") at such place as designated in writing by Holder designated, the sum of **$325,000.00** as follows:  monthly interest only payments at the interest rate of five percent (5%) per year and the balance on or before the five year anniversary of this agreement.

All or any part of the aforesaid sum may be prepaid at any time and from time to time without penalty.

In the event of any default by the undersigned in any payment when due or in the event of the suspension of actual business, insolvency, assignment for the benefit of creditors, adjudication of bankruptcy, or appointment of a receiver, of or against the undersigned, the unpaid balance of the principal sum of this promissory note shall at the option of the holder become immediately due and payable.

The maker and all other persons who may become liable for the payment hereof severally waive demand, presentment, protest, notice of dishonor or nonpayment, notice of protest, and any and all lack of diligence or delays in collection which may occur, and expressly consent and agree to each and any extension or postponement of time of payment hereof from time to time at or after maturity or other indulgence, and waive all notice thereof.

In case suit or action is instituted to collect this note, or any portion hereof, the maker promises to pay such additional sum, as the court may adjudge reasonable, attorneys' fees in said proceedings.

This note is made and executed under, and is in all respects governed by, the laws of the State of Arizona on this ___ day of March 2012

**Global Medical Equipment of America, Inc.**

By

Harold Halman, II, President and CEO

06/26/2012 15:59 FAX                                                                    ☑0005/0005

# PROMISSORY NOTE

**$325,000.00**                                                                    **March 31, 2012**

FOR VALUE RECEIVED, the undersigned, Global Medical Equipment of America, of 23025 N. 15ᵗʰ Avenue, Unit 106, Phoenix, AZ 85027 promises to pay to the order of Debra Sloan ("Holder") at such place as designated in writing by Holder designated, the sum of **$325,000.00** as follows:  monthly interest only payments at the interest rate of five percent (5%) per year and the balance on or before the five year anniversary of this agreement.

All or any part of the aforesaid sum may be prepaid at any time and from time to time without penalty.

In the event of any default by the undersigned in any payment when due or in the event of the suspension of actual business, insolvency, assignment for the benefit of creditors, adjudication of bankruptcy, or appointment of a receiver, of or against the undersigned, the unpaid balance of the principal sum of this promissory note shall at the option of the holder become immediately due and payable.

The maker and all other persons who may become liable for the payment hereof severally waive demand, presentment, protest, notice of dishonor or nonpayment, notice of protest, and any and all lack of diligence or delays in collection which may occur, and expressly consent and agree to each and any extension or postponement of time of payment hereof from time to time at or after maturity or other indulgence, and waive all notice thereof.

In case suit or action is instituted to collect this note, or any portion hereof, the maker promises to pay such additional sum, as the court may adjudge reasonable, attorneys' fees in said proceedings.

This note is made and executed under, and is in all respects governed by, the laws of the State of Arizona on this ___ day of March 2012

**Global Medical Equipment of America, Inc.**

By _____

Harold Halman, II, President and CEO

METROPHX-002893

# Exhibit 2

# STANDBY CREDITOR'S AGREEMENT

| SBA Loan # | 52693950-09 |
|---|---|
| SBA Loan Name | Global Medical Equipment of America, Inc. |
| Standby Creditor | Michael Trahktman |
| Standby Borrower | Global Medical Equipment of America, Inc. |
| Lender | Metro Phoenix Bank |

Global Medical Equipment of America, Inc. (Standby Borrower) owes $500,000.00 principal and interest to Michael Trahktman (Standby Creditor) as of the date of this Agreement (Standby Loan) (Copy of Standby Note attached).  To induce Metro Phoenix Bank (Lender) to make an SBA guaranteed loan to Standby Borrower, Loan Number 52693950-09 in the amount of $3,631,000.00 (Lender's Loan), Standby Creditor agrees: *(Check only one box)*

1. ☐    To accept no further payments on the Standby Loan until Lender's Loan is satisfied.

    ☐    To accept interest only payments at a rate of _____ % per annum (no principal payments) on the Standby Loan until Lender's Loan is satisfied or until notified by Lender to stop accepting payments.

    ☐    To accept payments of principal and interest at the rate of _____ % per annum on the Standby Loan unless notified by Lender to stop accepting payments.

    ☒    To accept payments of principal and interest at the rate of 5.00% per annum beginning on June 29, 2016.

2. To turn over to Lender payments received by Standby Creditor from Standby Borrower in violation of this Agreement within 15 days of receipt.

3. That the Standby Debt is and shall be subordinate to Lender's Loan, and all other present and future indebtedness, obligations, liabilities, claims, rights and demands of any kind which may be now or hereafter guaranteed by or owing from Borrower to Lender.

4. To take no action to enforce claims against Standby Borrower on the Standby Loan until Lender's Loan

{00511315;v1}                                                                                                      Page 1/3

METROPHX-002873

is satisfied and paid in full.

5. Any and all liens and security interests of Standby Creditor in the now existing or hereafter acquired real property and/or personal property of Standby Borrower (collectively, the "Collateral") shall be and hereby are subordinated for all purposes and in all respects to the liens and security interests of Lender in the Collateral, regardless of the time, manner or order of perfection of any such liens and security interests and regardless of any failure, whether intervening or continuing, of Lender's liens to be perfected liens.

6. To take no action against Standby Borrower's collateral, or any other collateral securing the Standby Loan, without written consent from the Lender, until Lender's Loan is satisfied and paid in full.

7. Lender, in its sole discretion, may take any action without affecting this Agreement, including but not limited to the following:
   a. Modify the terms of Lender's Loan.
   b. Grant an extension or renewal of Lender's Loan.
   c. Defer payments or enter into a workout agreement on Lender's Loan.
   d. Release or substitute collateral securing Lender's Loan.
   e. Forbear from collecting on existing collateral or requiring additional collateral.
   f. Declare a default on Lender's Loan and notify Standby Creditor to stop accepting payments.
   g. Agree to release, compromise, or settlement of Lender's Loan.

8. This Agreement applies to any successor to the Standby Creditor or assignee of this Agreement or of the Standby Note, including any bankruptcy trustee or receiver or guarantors or sureties of the Standby Note.

9. Additional Loans made by Standby Creditor will be subject to the terms of this Agreement, unless Lender agrees otherwise in writing.

Dated: ___4/28___, 2012

Standby Creditor:

Michael Trakhtman, Individually

METROPHX-002874

**EXHIBIT A**

STANDBY NOTE
(See Attached)

METROPHX-002875

06/25/2012 09:06 FAX

## PROMISSORY NOTE

**$500,000.00**                                                          March 31, 2012

FOR VALUE RECEIVED, the undersigned, Global Medical Equipment of America, of 23025 N. 15th Avenue, Unit 106, Phoenix, AZ 85027 promises to pay to the order of Michael Trahktman ("Holder") at such place as designated in writing by Holder designated, the sum of $500,000.00 as follows: monthly interest only payments at the interest rate of five percent (5%) per year and the balance on or before the five year anniversary of this agreement.

All or any part of the aforesaid sum may be prepaid at any time and from time to time without penalty.

In the event of any default by the undersigned in any payment when due or in the event of the suspension of actual business, insolvency, assignment for the benefit of creditors, adjudication of bankruptcy, or appointment of a receiver, of or against the undersigned, the unpaid balance of the principal sum of this promissory note shall at the option of the holder become immediately due and payable.

The maker and all other persons who may become liable for the payment hereof severally waive demand, presentment, protest, notice of dishonor or nonpayment, notice of protest, and any and all lack of diligence or delays in collection which may occur, and expressly consent and agree to each and any extension or postponement of time of payment hereof from time to time at or after maturity or other indulgence, and waive all notice thereof.

In case suit or action is instituted to collect this note, or any portion hereof, the maker promises to pay such additional sum, as the court may adjudge reasonable, attorneys' fees in said proceedings.

This note is made and executed under, and is in all respects governed by, the laws of the State of Arizona on this ___ day of March 2012

Global Medical Equipment of America, Inc.

By _____

Harold Halman, II, President and CEO

METROPHX-002876

# Exhibit 3

| | |
|---|---|
| ‖‖ **ABA**<br>**Insurance**<br>**Services** | ABA Insurance Services Inc.    www.abais.com<br>5910 Landerbrook Drive, Suite 100  800 274 5222 T<br>Mayfield Heights, Ohio 44124    800 456 6590 F |

November 4, 2016

Christopher L. LaVoy, Esq.
Tiffany & Bosco, P.A.
Seventh Floor Camelback Esplanade II
2525 E Camelback Road
Phoenix, AZ 85016

### *VIA EMAIL cal@tblaw.com AND REGULAR U.S. MAIL*

| Re: | Insured: | Metro Phoenix Bank |
|---|---|---|
| | Financial Institution Bond No.: | 8100008898-131 |
| | Claim No.: | ABA0002377 |
| | Matter: | Global Medical Equipment of America |

Dear Mr. LaVoy:

As you know, ABA Insurance Services Inc. provides third party claims administration on behalf of Everest National Insurance Company ("Everest"). As such, we received the Proof of Loss which was submitted by the Metro Phoenix Bank (hereinafter referred to as "Bank") to Everest.

After a careful review of all the documentation and facts supplied to ABA Insurance Services Inc. as well as the in person interviews conducted in connection with this matter, Everest must decline coverage for the Bank's claim. Our reasoning for this decision is set forth below.

## I.     FACTS

### *Global Medical Equipment of America, Inc.*

Global Medical Equipment of America, Inc. (GMEA) was a Phoenix based corporation that was formed in early 2010 as a holding company focusing on durable and home medical equipment products. It owned and operated Medicare accredited retail stores in five states as well as a wholesale division. These types of stores have been traditionally owned locally as proprietorships or S corps to sell devices such as wheelchairs, crutches, walkers, catheters, lift chairs, CPAP machines, bedpans, colostomy bags, feeding tubes, hospital beds, prosthetic devices, etc., that are used for patients whose care is being managed from a home or other private facility managed by nonprofessional caregivers or family members. Most purchases are completed with a medical doctor's prescription and receive reimbursement from private health insurance or Medicare which is why it is crucial for such stores to be Medicare accredited.

GMEA's business plan sought to aggressively expand by acquiring existing, locally owned, Medicare certified and accredited stores in the top 20 demographic regions with elderly and baby boomer populations. A network of acquired retail stores would then be complemented with three wholesale distribution centers strategically located to cover the entire US market.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 2

GMEA had six retail stores in five states (Arizona, Washington, Louisiana, Florida and Virginia) in 2012 when it approached the Bank to obtain funding to purchase two additional stores: A & A Medical (A&A) in Baltimore and JCare Medical (JCare) in Chicago. The purchase of the stores was consistent with the business plan in that the two stores were Medicare accredited and increased the national GMEA footprint by two additional states.

### GMEA Loan from the Bank

GMEA represented to the Bank that the purchase price for JCare was $1,125,000 and the price for A&A was $2,500,000. The proposal was to obtain a purchase loan from the Bank under the Small Business Administration (SBA) 7(a) Loan Program that is authorized by Section 7(a) of the Small Business Act of 1953, 15 U.S.C. § 636(a). Under this program, the SBA guarantees 75% of the loan amount. The proposed GMEA loan was to be collateralized by interest in the GMEA business rather than with real estate or other collateral.

GMEA was not a customer of the Bank and it had an existing SBA guaranteed loan in the amount of approximately $1,620,000 from RepublicBank AZ. After discussions between GMEA and the Bank in May and June, 2012, it was decided that a loan proposal would be submitted for SBA authorization for the total amount required to purchase A&A and JCare and to pay off the RepublicBank AZ loan. The payoff of the RepublicBank AZ loan would allow the Bank to have a first priority on its liens of GMEA stock and assets. A condition of the loan would be a required capital injection of $600,000. The SBA always requires an equity injection on a 7(a) loan. The SBA would not have guaranteed the loan if it was not made and the Bank could not and would not have made the loan if the SBA did not guarantee it.

A loan application was submitted to the SBA on 06/12/2012. The application was signed by Harold Halman, President and CEO of GMEA, Alexander Schaap, who was the company's CFO, and Craig Boates, the company's general counsel. It was represented to the Bank that Schapp was the majority owner holding 80.5% of GMEA stock and Boates owned 19.5%. Halman and Schaap committed to providing the $600,000 capital injection as an equity investment. The equity injection was to fund a portion of the purchase prices of JCare and A&A.

On 06/18/2012, the SBA provided an Authorization for the loan in the amount of $3,929,500.00. The Authorization required the loan proceeds be used to 1) purchase all outstanding stock of A&A and JCare; 2) pay off the RepublicBank AZ loan; and, 3) pay the SBA guarantee fee. The SBA Authorization had many other conditions including properly securing the loan and ensuring that the required capital injection is properly made.

### Loan Closing and Retention of Starfield & Smith, P.C.

In anticipation of receiving SBA authorization of the loan, the Bank retained the law firm of Starfield & Smith, P.C. (Starfield) to ensure a properly documented and secured loan that complied with the conditions contained in the Authorization and the SBA's standard operating procedures. The GMEA loan was a large and complex loan for the Bank. Without the SBA guarantee, the Bank would not have been eligible to fund the loan. The loan was especially complex because it required closing the loan in Arizona as well as closing the purchases of two operating business in two other

Christopher L. LaVoy, Esq.
November 4, 2016
Page 3

states by GMEA using a substantial portion of the loan proceeds. The loan presented special risk because it was to be collateralized only by commercial-business collateral rather than real estate.

According to the Bank, Starfield agreed to assume due-diligence responsibility regarding the equity injection and UCC searches. Further, Starfield agreed to consult with and guide the Bank through the steps required to close the loan; to protect the Bank's SBA guaranty; and, to satisfy the steps required to close the loan. This, according to the Bank, included Starfield doing the following: preparing closing settlement statements; gathering, investigating, and reviewing the documents needed to close the loan including the portion of the transaction relating to the out-of-state purchases of A&A and JCare; determining that GMEA satisfied the requirements of the loan documents; verifying the absence of adverse litigation and liens that could impair the Bank's security on the loan or impair GMEA's ability to pay the loan; ensuring that GMEA had provided all documents needed to comply with the loan documents; communicating with GMEA management and third parties as needed; investigating potential irregularities in the loan requirements; consulting and advising the Bank throughout the loan process; and distributing the loan proceeds. To ensure Starfield had complete control over whether the loan closed in accordance with the SBA's procedures and conditions, Starfield agreed to act as the escrow agent for the loan.

The loan was completed for the final, total amount of $3,631,000.00 and a note was executed on 06/28/2012. The closing involved the purchasing of JCare and A&A and payoff of the RepublicBank AZ loan.

*Default, Receivership and Discovery of Fraud*

GMEA failed to make payments that were due on the note on 07/05/2013 and every subsequent month with the exception of two payments on 12/05/2013. These later payments did not cure the default and the Bank, pursuant to its rights under the note, filed suit in Maricopa County, Arizona, Superior Court and on 01/10/2014 obtained an order placing GMEA in receivership.

Through the receivership, the Bank obtained access to GMEA's server and computer hard drives. A search of the server and hard drives identified that documents provided by GMEA to the Bank to obtain the loan were fraudulent. It was essentially found that many of the documents, such as the original JCare and A&A purchase contracts had been altered to show higher purchase prices for the two entities than was agreed to presumably in order to obtain a larger loan and use the proceeds for something other than the purchase prices. The purchase contract the Bank was provided listed the purchase price of JCare as $1,125,000.00. The actual price agreed to was $850,000.00 and this amount was contained in the agreement signed by the seller Debra L. Sloan and verified by her as being the actual price.[1] Someone at GMEA altered the agreement to the higher price and gave this altered document to the Bank for purposes of obtaining the loan. With A&A, the agreed price, as verified by the seller, Mikhail Trakhtman, was $2,000,000.00, the agreement provided to the Bank was altered to list the price as $2,500,000.00.

---

[1] Counsel for the Bank discovered this on copies of the actual purchase agreements saved on the hard drives of the GMEA server and Schaap's laptop after the receivership order.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 4

Further investigation and subsequent litigation revealed evidence suggesting the owners of GMEA obtained the loan through multiple fraudulent statements and documents including, in addition to the purchase contracts, forged subordination agreements (also referred to as Standby Creditor's Agreement) and a fraudulent certification verifying certification of the equity injection. The loan application contains inaccurate statements and representations that were most likely fraudulent. It was also learned that there were three pending matters involving litigation against GMEA that would have disqualified it from obtaining an SBA loan or a loan from the Bank. It was also determined that Halman owned 40.25% of GMEA stock and Schaap held only 40.25%. Halman was not qualified to obtain an SBA loan so his ownership was presumably concealed in order to obtain the loan. If his true ownership had been known, the SBA would not have authorized the loan and the Bank would not have given the loan.

All told, the Bank learned that the GMEA loan was obtained through fraudulent means in at least the following ways:

1) the Bank was told Halman was not an owner when he appears to have been an owner of 40.25% of its stock;

2) the Bank was provided altered purchase agreements listing the purchase prices of JCare and A&A at higher amounts than was agreed to with the sellers;

3) there was never an equity injection; and

4) there were multiple lawsuits pending against GMEA that would have disqualified it for an SBA loan.

If any of this information was known the loan would not have been authorized by the SBA or made by the Bank or, if any of this information was known prior to funding of the loan, the funds would not have been authorized to be released by the Bank.

*Bank's Allegations against Starfield*

Having learned of all of the defective documents and false representations after obtaining the receivership order on 01/10/2014, and also learning that the Receiver would not be able to recover on the loan either through liquidation, sale or otherwise, the Bank filed a complaint for legal malpractice against Starfield on 08/25/2014 in Superior Court of Arizona for Maricopa County. The complaint was removed to the United States District Court for Arizona. An amended complaint was filed on 03/04/2015 adding claims for breach of contract, breach of escrow agreement and breach of fiduciary duty.

The Bank claims Starfield knew that it was relying on Starfield to protect the Bank's SBA guaranty; to implement the due diligence and safeguards needed to properly complete the multi-state closings; ensure proper distribution of loan proceeds; and, to create a properly documented

Christopher L. LaVoy, Esq.
November 4, 2016
Page 5

first-lien under the SBA's Authorization and operating procedures.[2] The complaint alleges that Starfield repeatedly disregarded prudent lending standards by failing to investigate suspicious facts and used unreliable and financially conflicted sources of information as evidentiary support for due diligence.[3] The complaint alleges that Starfield looked to Boates and Schaap for information and documents but they were conflicted as they were both members of GMEA's management. Starfield relied on Boates to verify critical facts and did so even though he was an officer of GMEA and was financially conflicted because of his nearly 20% ownership in the company. Also, there was inconsistent information provided about the capital injection that should have led Starfield to question and investigate independently the capital injection and if it had done so it would have been readily confirmed that there was no capital injection and the loan would not have been closed and loan funds released. In addition to the inconsistent information, Starfield relied on receiving the proof of the capital injection, including letters from an attorney and brokerage statements, from Boates. Not only should this information have been obtained independent from Boates but also directly from the Starfield lawyer involved in transferring the funds and verified with her. Instead, the information that was received did not comply with SBA guidelines. As it turned out, all the information was fraudulent and the documents were forgeries. The Bank alleges that Starfield's failure to obtain sufficient proof of the capital injection was negligent and that if the Bank had known that Halman and Schaap had not made the equity injection or that the documents were fraudulent the Bank would have not made the loan.[4]

The complaint also alleges that after $800,000 in loan proceeds were wired by Starfield to JCare seller, Debra Sloan, she sent the money back because she was only owed $650,000 under the purchase contract. Rather than stopping the loan closing and investigate Sloan's reasons for returning the $800,000, Starfield accepted the explanations from GMEA management (Boates and Halman) that the money should be rewired to Sloan which it did. Thereafter, Sloan wired $150,000 of the money to GMEA which diverted the money from the purchase in violation of the SBA Authorization.

The complaint alleges that Starfield failed to independently investigate whether there was litigation against GMEA, the discovery of which would have resulted in the loan not being made. Instead, Starfield relied on a letter from Boates stating there was no pending litigation. In fact, there were three pending lawsuits and some of the funds from the loan that were not used for the purchase prices of JCare and A&A were used to settle one of the suits.

The complaint alleges that Starfield was negligent in relying on GMEA to provide subordination agreements and landlord-release documents that were essential to a competent loan closing that satisfied the SBA's Authorization and operating procedures. Starfield accepted, without independent verification, an opinion letter from Boates representing that all documents needed for the Bank to have a valid first-security-lien interest had been signed. In fact, "many of the documents needed for an enforceable first-lien security interest that met the SBA Authorization's

---

[2] Paragraph 86 of Amended Complaint.
[3] Paragraph 87 of Amended Complaint.
[4] Paragraph 114 of Amended Complaint.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 6

collateral requirements had been forged or fraudulently prepared including the subordination agreements, landlord consents, and standby-agreements . . ." [5]

The complaint alleges that Starfield failed to contact any of the counterparties to the agreements nor did it obtain copies of any of the documents directly from the parties that purported to have signed them and that its decision to rely on Boates (despite his conflicts of interest and suspicious conduct) without contacting any of the counterparties to the agreements, fell below the standard of care.[6]

With regard specifically to the A&A transaction, the complaint alleges that Starfield received a copy of the true purchase agreement reflecting the lower price in an email. Despite receiving this version of the agreement with a different price, Starfield did not make any inquiry of the discrepancy. When the Receiver found the different version of the agreement on the hard drives of the GMEA server and Schaap's laptop, it was discovered that the price agreed to and paid for was different and the amount equaling the difference was not used for the purpose authorized by the SBA authorization. Inasmuch as Starfield knew of the two versions, if it had investigated the issue, the fraud would have been discovered prior to the release of loan funds and the loan would have been cancelled. The Bank's amended complaint states at paragraph 141 that "[a]s a result of Starfield's negligence regarding the fraudulent A&A Purchase Agreement, the Fraudulent A&A Closing Statement, and other irregularities in the Loan, Global Medical [GMEA] successfully induced the Bank to make the Loan in an amount greater than the Bank would have done had it known the true purchase price." Further, the Bank's complaint states that "Starfield's failure to conduct a signature closing attended by the parties; failure to contact the lawyers for the Trakhtmans [the sellers of A&A] regarding their clients' signatures; or to obtain original "blue ink" signed copies of those documents from the Trakhtmans or their attorneys fell below the standard of care . . ." and "[t]he Bank would not have funded any part of the Loan if it had known that Global Medical was using a fraudulent purchase contract and closing statement that overstated the A&A purchase price."

With regard specifically to the JCare transaction, the complaint alleges Starfield failed to directly contact JCare's seller or attorney to verify the authenticity of the purchase agreement and closing statement. Nor did Starfield arrange a closing to witness the parties' signatures on these documents even though Starfield was acting as escrow agent for the transaction and was itself required to sign the final-closing statement.[7] The Bank's complaint alleges that "[if] Starfield had contacted Sloan [the seller of JCare stock] or Rakowski [JCare's attorney] before wiring the closing funds, Starfield would have discovered that [GMEA] was attempting to perpetrate a fraud that Starfield could have prevented by refusing to wire the Loan proceeds."[8] Further, the complaint alleges that Starfield's failure to "conduct a signature closing attended by the parties; failure to contact Sloan or Rakowski regarding the JCare transaction: or to obtain from Sloan or Rakowski the original 'blue ink' signed copies of the documents relating to the purchase, fell below the standard of care for an attorney with special SBA skill and experience." In addition, the Bank's complaint alleges that when Sloan

---

[5] Paragraph 127 of the Amended Complaint.
[6] Paragraph 130 of the Amended Complaint.
[7] Paragraph 150 of Amended Complaint.
[8] Paragraph 153 of Amended Complaint.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 7

returned the wired $800,000 for the purchase of JCare (because the real price was only $650,000) Starfield was negligent in not investigating or contacting Sloan or Rakowski about the return of the funds and instead simply contacted Boates and Schaap who convinced Starfield to rewire the $800,000 to Sloan and have her wire $150,000 to GMEA. If Sloan or Rakowski had been contacted by Starfield it would have been learned that the actual purchase price was only $650,000 and the Bank would have instructed Starfield not to make the second $800,000 wire transfer because the purchase agreement provided to the Bank would have been exposed as a fraudulently prepared document. Further, the complaint alleges that "if Starfield had competently investigated the rejected wire, and then consulted with the Bank, the Bank would have investigated other aspects of the transaction with [GMEA] and would have learned about the fraud relating to the A&A and JCare purchases and would have been in a positon to potentially reduce its losses."[9]

The complaint states that "the Bank relied on Starfield to perform its services competently and with the skill and care in SBA closings Starfield claimed to have" but, instead, Starfield "negligently represented the Bank and through its negligence allowed [GMEA] to trick the Bank into funding a $3.6 million loan that would never have been made if the truth about the phantom equity injection and other deceptive facts regarding the A&A and JCare purchase documents had been known." [10] The complaint states that "[a]s a direct and proximate result of Starfield's negligence and breach of its contract with the Bank, the Bank suffered substantial damages of not less than $3,600,000 plus interest, attorneys' fees, and costs."[11]

The lawsuit by the Bank against Starfield remains pending. There have been mediations and negotiations of a settlement, but there has been no settlement.

In the meantime, an associate general counsel for the SBA indicated to Stephen P. Haggard, President of the Bank, that he expects the SBA to deny the loan guarantee, requiring the Bank to reimburse the SBA for its payment of 75% of the loan. It is my understanding that the Bank believes the SBA will base its denial and demand for reimbursement on the failure to ensure in the ways required by SBA standard operating procedures that the equity injection was made. However, to date, it is my understanding that this demand has not been made.

## II.   NOTICE OF CLAIM

On 03/01/2016, ABA Insurance Services Inc. received notice of a claim under the bond. The notice consists of a letter from Mr. Haggard that states the Bank "has incurred losses stemming from identified Borrower Fraud." The letter contains a list, which is noted to be not all inclusive, that the Borrower fraud was perpetrated using the following:

1) Fraudulent Loan Application Submitted to Bank by Borrower;
2) Sham Purchase Contracts Presented to Bank;
3) Sham Certification Letter Presented to Bank Verifying "Bogus" Equity Injection; and,

---

[9] Paragraph 164 of Amended Complaint.
[10] Paragraphs 165 and 166 of Amended Complaint.
[11] Paragraph 167 of Amended Complaint.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 8

    4)  Forged Seller Subordination Agreements Presented to Bank by Seller of Business.

Mr. Haggard's letter states that the "Actual Losses (to date)" are $1,759,662 which includes legal fees & receivership fees. The letter states the estimated damages are $4,559,666 which includes legal fees and receivership fees.

## III.   PROOF OF LOSS

On 04/28/2016, ABA Insurance Services Inc. received the proof of loss dated 04/18/2016. The proof of loss makes a claim for a loss in the amount of $2,169,793.09 as a direct result of Securities. The proof of loss references an accompanying letter dated 04/21/2016 from you that provides a factual background of the circumstance of how the loss occurred.

your letter states that the "Bank suffered a loss under Insuring Agreement (E) when it executed credit to GMEA in reliance on the forged and counterfeit documents." Page 3 of letter.

Your letter states as follows:

> GMEA engaged in a complicated and elaborate fraud to induce the Bank to make the Loan, which included *inter alia*:
>
> - Misrepresenting the purchase prices of A&A and JCare so that GMEA's principals could pocket the extra loan money;
> - Misrepresenting that GMEA was paying $480,000 of its own funds towards the purchase of A&A and JCare;
> - Misrepresenting that GMEA was purchasing 100% of A&A's shares when it was only purchasing 90%;
> - Misrepresenting the share-ownership percentages of GMEA's owners; and
> - Forging and counterfeiting numerous Loan-related documents to support these misrepresentations.

The letter states that the fraud was perpetrated by GMEA's three owners – Halman, Schaap and Boates – all of whom are under criminal investigation by the U.S. Attorney's office.

The letter identifies, in addition to Mr. Haggard's 03/01/2016 list of forged and/or counterfeited documents, the following:

    1)  Standby Creditor's Agreement with forged signature of Trakhtman
    2)  Standby Creditor's Agreement with forged signature of Sloan
    3)  A&A stock certificate with forged signature of Craig Boates and that is a counterfeit
    4)  JCare stock certificate with forged signature of Craig Boates
    5)  GMEA stock certificate for Alexander Schaap that is counterfeit
    6)  GMEA stock certificate for Craig Boates that is counterfeit

Christopher L. LaVoy, Esq.
November 4, 2016
Page 9

The letter states that the "Bank discovered the basic outline of the fraud in early 2014, although did not begin to confirm the forging and counterfeiting of key Loan-related documents until mid-2015." Page 3. The letter elaborates as follows:

> Specifically, GMEA defaulted in mid-2013 and the Bank sued it in December 2013 [citation omitted]. The court appointed a receiver for GMEA in early 2014. The receiver proceeded to investigate GMEA's financial affairs, which lead to initial discovery of the fraud. The Bank proceeded to conduct formal discovery in the action, as well as in Halman's ensuing bankruptcy, which revealed the finer details of the fraud [citation omitted]. In particular, the Bank did not confirm that Trakhtman's signatures were forged until it deposed him in April 2015 through Halman's bankruptcy.

The letter states that the loss as of 04/10/2016 is $2,169,793.09 but the 75% guaranteed by the SBA may be denied which would significantly increase the amount of the loss. The $2,169,793.09 is calculated and itemized in the letter as follows:

| | |
|---|---|
| Principal Balance Charge-off | 830,500.43 |
| Accrued Interest | 112,068.91 |
| Late Fees | 25,914.85 |
| Receivership Fees | 200,000.00 |
| Legal Fees | 1,001,308.09 |

## IV.   COVERAGE ANALYSIS

The Bank claims its loss has coverage under Insuring Agreement (E) of the Bond. There is no coverage for the following reasons: 1) Notice of the discovery of the loss was provided after the expiration of the bond; 2) the documents presented by the Bank as being forged, altered or counterfeit are not documents covered under Insuring Agreement (E); and, 3) the forged, altered or counterfeit documents did not cause the loss.

### A. There is No Coverage Because Notice of the Loss was Provided after the Bond Expired

#### 1. Discovery and Applicable Bond

Coverage is analyzed under Bond number 8100008898-131 that has a Bond Period identified in Item 2 of the Declarations Page of 05/22/2013 to 05/22/2014. This Period is changed in an Amendment to the Declarations Page to 05/22/2013 to 10/24/2014. This bond is implicated because the "Bank discovered the basic outline of the fraud in early 2014" when the Receiver investigated GMEA's financial affairs which led to the initial discovery of the fraud. The Bank's complaint filed on 08/25/2014 against Starfield identifies the fraud. The complaint identifies the owners of GMEA as having perpetrated a fraud and how. It also identifies many of the documents that the Bank presents as covered documents under Insuring Agreement (E).

The Bond states under Conditions and Limitations at Section 3 in pertinent part follows:

Christopher L. LaVoy, Esq.
November 4, 2016
Page 10

>This bond applies to loss first discovered by the Insured during the Bond Period. Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not then be known.

The Bank was aware of facts which would cause a reasonable person to assume that a loss of the type covered by the bond, specifically Insuring Agreement (E), had been incurred by "early 2014" when it discovered that fraud was associated with the transaction. Accordingly, discovery could not have been at any time after early 2014. I have discovered no evidence that discovery occurred prior to the appointment of the receiver on 01/10/2014. Indeed, prior to 07/05/2013, when GMEA first failed to make a payment, there was no indication that there was any problem with the loan. Accordingly, the loss was discovered in the bond period of 05/22/2013 to 10/24/2014 that applies to bond number 8100008898-131.

### 2. Late Notice and Late Proof of Loss Preclude Coverage

At Section 5(a) through (b) of Conditions and Limitations, the bond states in pertinent part as follows:

>(a)    At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof.

>(b)    Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

The Bank provided notice on 03/01/2016 which was over two years after the loss was discovered. Not only was notice late, it was received well after the bond had expired on 10/24/2014. The Bank's violation of Section 5(a) and 5(b) of the bond bar the Bank's claim.

In *Alianza Hispano-Americana v. Hartford Acci. & Indem. Co.*, 1954 U.S. App. LEXIS 3651, 209 F.2d 578 (9th Cir. Ariz. 1954), the Court upheld a finding that conditions of notice and furnishing of proof of loss in the bond are required for coverage. The court affirmed a judgment for the insurer on findings that the insured had failed to comply with conditions precedent prescribed by the bond in respect of the giving of notice and the furnishing of proofs of loss.

While prejudice is not required to demonstrate there is no coverage under the bond, Everest reserves all rights with regard to proving prejudice for the late notice. For instance, and in no way limiting in any way its reservation of rights, notice, outside the bond period is *a fortiori* prejudice to the underwriter. Further, in the two years since the loss was discovered, extensive litigation has taken place including discovery in the legal malpractice case and the Halman bankruptcy case with respect to which, Everest had no ability to be informed of or participate in.

The Bank's violation of Sections 5(a) and 5(b) of the bond bar the Bank's claim.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 11

### 3. Bond issued 10/24/2014

The Bank requested the claim be considered under bond number 8100008898-141 that has a bond period of 10/24/2014 to 10/24/2017. Section 3 of the Conditions and Limitations portion of this bond provides that the bond "applies to loss first discovered by the Insured during the Bond Period." Because the loss was discovered in early 2014, it is not covered by bond number 8100008898-141 because it was not discovered in the bond period.

### B. The Bond Does Not Provide Coverage for the Documents Identified by the Bank as Altered, Forged, Counterfeit or Otherwise Fraudulent

The Bank's loss arises out of its loan to GMEA. In general, loan losses such as the one experienced by the Bank are excluded from Bond coverage. Exclusion (e) of the Bond provides that the Bond does not cover:

> (e)   loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including but not limited to the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (E) or (G).

There are three exceptions to the Loan Loss Exclusion, i.e., when coverage is available under Insuring Agreements (A), (E) or (G). The facts of this claim do not implicate the provisions of either Insuring Agreement (A), Fidelity, or (G), Fraudulent Mortgages. Coverage for this matter has been submitted and analyzed under the terms of Insuring Agreement (E), Securities.

### 1. Coverage under Insuring Agreement (E)

Insuring Agreement (E) provides coverage as follows:

> The Underwriter, in consideration of an agreed premium, and in reliance upon all statements made and information furnished to the Underwriter by the Insured in applying for this bond, and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Insured for:

*   *   *

SECURITIES

> (E)   Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
> (1)   acquired, sold or delivered or given value, extended credit or assumed liability, on the faith of, any Written, Original
>
> (a)   Certificated Security,

Christopher L. LaVoy, Esq.
November 4, 2016
Page 12

> (b)   Document of Title,
>
> (c)   deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,
>
> (d)   Certificate of Origin or Title,
>
> (e)   Certificate of Deposit
>
> (f)   Evidence of Debt,
>
> (g)   corporate, partnership or personal Guarantee, or
>
> (h)   Security Agreement,
>
> which (i) bears a handwritten signature which is material to the validity or enforceability of the security, which is a Forgery, or (ii) is altered, but only to the extent the Forgery or alteration causes the loss or (iii) is lost or stolen;
>
> (2)   guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, guarantee, endorsement or any items listed in (a) through (h) above; or
>
> (3)   acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (e) above which is a Counterfeit, but only to the extent the Counterfeit causes the loss.
>
> Actual physical possession of the items listed in (a) through (h) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of such items.
>
> A reproduction of a handwritten signature is treated the same as the handwritten signature. An electronic or digital signature is not treated as a reproduction of a handwritten signature.

In order for coverage to be available under the terms of Insuring Agreement (E), the following requirements must be met:

> (1) The Bank must have extended credit on the faith of one of the specific types of documents enumerated in Insuring Agreement (E);
>
> (2) that document must have been a Written, Original;
>
> (3) the document must contain one of the specified defects set forth in Insuring Agreement (E), i.e., forged, altered, lost, stolen, or in certain circumstances, Counterfeit; and
>
> (4) the Bank must have had actual physical possession or the Written, Original document prior to extending credit on the faith of the document.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 13

### 2. Documents Presented by Bank for Coverage Under Insuring Agreement (E)

The Bank identified in Mr. Haggard's 03/01/2016 letter the following list of forged and/or counterfeited documents:

1) Fraudulent Loan Application Submitted to Bank by Borrower,
2) Sham Purchase Contracts Presented to Bank,
3) Sham Certification Letter Presented to Bank Verifying "Bogus" Equity Injection,
4) Forged Seller Subordination Agreements Presented to Bank by Seller of Business

The proof of loss identified the following as forged and/or counterfeit documents:

1) Standby Creditor's Agreement with forged signature of Trakhtman
2) Standby Creditor's Agreement with forged signature of Sloan
3) A&A stock certificate with forged signature of Craig Boates and that is a counterfeit
4) JCare stock certificate with forged signature of Craig Boates
5) GMEA stock certificate for Alexander Schaap that is counterfeit
6) GMEA stock certificate for Craig Boates that is counterfeit

The documents above are analyzed for coverage as follows in the order presented above. Each element required under Insuring Agreement (E), Covered Document, Written Original, Specified Defect and Actual Physical Possession is considered for each of the documents the Bank presents for coverage.

#### a. Fraudulent Loan Application Submitted to Bank by Borrower

The loan application signed by the GMEA owners presumably contains false information. Insuring Agreement (E) of the Bond does not guarantee the truth of documents. If documents are not truthful and a loss results therefrom, the loss is not covered. *See, Liberty National Bank v. Aetna Life & Casualty Company*, 568 F. Supp. 860 (D. N.J. 1983). The Bank has not and cannot satisfy all the requirements of Insuring Agreement (E) with respect to the loan application.

##### *Covered Document*

The first requirement of Insuring Agreement (E) the Bank must establish is that it extended credit in good faith and in reliance on a specific type of document covered by Insuring Agreement (E). A loan application is not a covered document under the terms of Insuring Agreement (E) listed in sections (a) through (h). Accordingly, this element is not satisfied.

##### *Written Original*

The second requirement of Insuring Agreement (E) the Bank must establish is that it extended credit in good faith in reliance on a covered document which was a Written, Original. Written is defined in Section 1(v) of the Bond as follows:

Written means expressed through letters or marks placed upon paper and visible to the eye.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 14

Original is defined in Section 1(q) as follows:

> Original means the first rendering or archetype and does not include photocopies or
> electronic transmissions even if received and printed.

The loan application is a Written document and the Bank received the Original. This element is
met but the application is not a covered document.

### Specified Defect

The third requirement of Insuring Agreement (E) the Bank must establish is that it extended credit
in good faith in reliance on a Written Original covered document which is forged, altered, lost,
stolen, or in certain circumstances, Counterfeit. There is no allegation that the application the Bank
received is defective in one of the ways required by Insuring Agreement (E), i.e., it is not forged,
altered, lost, stolen or Counterfeit. This element is not met.

### Actual Physical Possession

The last requirement of Insuring Agreement (E) the Bank must establish is that it had actual
physical possession of the Written Original of the loan application. The Bank did receive and had
actual physical possession of the Written Original before it extended credit but because it is not a
covered document and contains no specified defect, there is no coverage under Insuring Agreement
(E).

The Bank's claim regarding the fraudulent loan application is based on the fact that the information
contained in the document is not truthful – a claim that is not covered by Insuring Agreement (E)
and otherwise excluded from coverage by virtue of Exclusion (e).

### b. Sham Purchase Contracts Presented to Bank

The Stock Purchase Agreements are two documents that GMEA provided to the Bank indicating
agreement to purchase stock of JCare and A&A by GMEA. The JCare document contains an
agreement for the purchase of all outstanding JCare stock by GMEA and the A&A contract does
likewise for its stock. The documents are presumed to be altered, forged or counterfeit. Deposition
testimony by the signatories of the agreements indicated that the purchase amounts were altered.

### Covered Document

The Bank presents the Stock Purchase Agreements as Security Agreements under Insuring
Agreement (E)(1)(h). Security Agreement is defined in the bond in Section 1 of Conditions and
Limitations at subsection (s) as follows:

> Security Agreement means a Written agreement which creates an interest in
> personal property or fixtures and which secures payment or performance of an
> obligation.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 15

The Stock Purchase Agreements are between GMEA as buyer and each seller. With regard to A&A, the seller is Mikhail Trakhtman and with regard to JCare, the seller is Debra Sloan. Both are agreements between the parties to sell stock. The Factual Background letter attached to the proof of loss states that the Agreements qualify as a Security Agreement because "each Stock Purchase Agreement, as reflected in Section 5.2 thereof and the exhibits thereto, grants the seller a security interest in GMEA's assets, including the purchased stock, to secure GMEA's repayment of the promissory notes given the sellers."

Section 5.2, (Section 5 is titled "Buyer's Closing Documents") of each agreement states as follows:

> At the Closing, the Buyer shall execute and deliver to the Sellers the following documents:
>
> \* \* \*
>
> 5.2 *Security Documents*. The Buyer Security Agreement, duly executed by the Buyer, together with stock powers endorsed in blank for each pledge of stock or equity in accordance therewith as well as the original stock certificates or instruments representing stock or securities subject to such pledge; the Corporation Security Agreement, duly executed by the Corporation; and the Guarantor Security Agreements, duly executed by each of the Subsidiaries.

Under Section 2 of each Stock Purchase Agreement, titled "Purchase Price," at subsection 3, the agreements state as follows:

> 2.3 As security for the full and prompt satisfaction of Buyer's obligations under the Notes, (i) Buyer shall grant to Sellers a security interest in and shall pledge all the Stock, as well as all of the stock, securities and other equity interests held by the Buyer in each of the Subsidiaries, pursuant to a security and pledge agreement, in the form attached hereto as Exhibit C (the "Buyer Security Agreement"), (ii) Buyer shall cause the Corporation, as a guarantor of Buyer's obligations under the Notes, to grant to Sellers a security interest in all of the assets of the Corporation, pursuant to a guaranty and security agreement, in the form attached hereto as Exhibit D (the "Corporation Security Agreement") and (iii) Buyer shall cause each of the Subsidiaries, as a guarantor of Buyer's obligations under the Notes, to grant to Sellers a security interest in all of its assets, pursuant to a guaranty and security agreement, in substantially the form attached hereto as Exhibit E (each a "Guaranty Security Agreement").

The bond specifically provides that a defective document cannot be combined with another document not defective in order to trigger coverage. This is set forth in the Anti-Bundling provision contained in Section 9 of the Conditions and Limitations of the bond that states as follows:

> If any Insuring Agreement requires that an enumerated type of document be altered or Counterfeit, or contain a signature which is a Forgery or obtained through trick, artifice, fraud or false pretenses, the alteration or Counterfeit or signature must be on or of the enumerated document itself not on or of some other document

Christopher L. LaVoy, Esq.
November 4, 2016
Page 16

submitted with, accompanying or incorporated by reference into the enumerated document.

The Stock Purchase Agreements provide security for payment by virtue of the documents attached and incorporated into the agreements pursuant to Section 2.3 and 5.2 (Buyer Security Agreement, Corporation Security Agreement and Guaranty Security Agreement) and not standing alone. The documents incorporated into the Stock Purchase Agreements are not alleged to be forged or otherwise defective. Because of this, the Stock Purchase Agreements are not Security Agreements because they do not, standing alone, secure payment of an obligation. Furthermore, the Bank does not have proof in the form of testimony or sworn affidavit that the agreements were forged or altered. The deposition testimony of Trakhtman and Sloan was not specific in this regard although they did certainly testify that the purchase agreements they signed were not the ones the Bank received from GMEA because the purchase prices were different. Based upon the testimony, the Bank has not presented evidence of whether there was an alteration or forgery.

### Written Original

The second requirement of Insuring Agreement (E) the Bank must establish is that it extended credit in good faith in reliance on a covered document which was a Written Original. The Stock Purchase Agreements are written on paper. The Bank has the "blue ink" original of the JCare agreement but not for the A&A agreement. The Bank did not have the original of the A&A agreement. Accordingly, this requirement is not met. Also, the Bank has not demonstrated that it had the original of the JCare agreement at the time it extended credit. Although the "blue ink" copy is contained in the Bank loan file, it appears that the Bank did not have the "blue ink" copy at the loan closing. As alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. It is not known when the original JCare agreement was received by the Bank. It appears that it was received after the funds were released on the loan. Accordingly, the Bank has not proven the requirement that it extended the credit in reliance on a covered document which was a Written Original.

### Specified Defect

The third requirement of Insuring Agreement (E) the Bank must establish is that it extended credit in good faith in reliance on a Written Original covered document which is forged, altered, lost, stolen, or in certain circumstances, Counterfeit. The Bank maintains that the agreements contain the forged signatures of the Sellers, Mikhail Trakhtman and Debra Sloan. Both testified that they did not sign the Agreements containing the higher purchase prices. They did not testify that their signatures were forged. It is unclear if the JCare document was altered with the forged signature or that the signature was forged with the altered purchase price and then submitted to the Bank. Because the Bank has not proved the forgery, this requirement has not been established.

### Actual Physical Possession

The last requirement of Insuring Agreement (E) that the Bank must establish is that it had actual physical possession of the Written Original of the Stock Purchase Agreements. The Bank has the "blue ink" original of the JCare agreement but not for the A&A agreement. The Bank has not

Christopher L. LaVoy, Esq.
November 4, 2016
Page 17

demonstrated that it had actual physical possession of both at the time it extended credit. Although the "blue ink" copy of the JCare agreement is contained in the Bank loan file it is unknown if the original was obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had actual physical possession prior to extending credit.

### c.    Sham Certification Letter Presented to Bank Verifying "Bogus" Equity Injection

The Bank has determined that the letter from an attorney verifying that the equity injection had been made was fraudulent. It appears that it may have been created by GMEA and sent to Starfield from GMEA. It was not from the attorney identified in the letter and as it was later learned no equity injection was made.

### *Covered Document*

Mr. Haggard identified the sham certification letter in his initial letter of a potential claim. His letter does not identify any insuring agreement that might be implicated and the Bank's proof of loss and accompanying documentation does not identify a provision of Insuring Agreement (E) where coverage might be triggered. The letter is not among the documents listed in Insuring Agreement (E)(1)(a) through (h) and is accordingly not a covered document.

### *Written Original*

The letter contained in the loan file is a copy of the letter that appears to have been transmitted electronically to the Bank. Accordingly, the Bank did not rely on the Written Original to extend the credit.

### *Specified Defect*

What is known about the creation of the document is that it was completely made up by someone at GMEA by cutting and pasting portions of a letter, including letterhead, from the real law firm called Saul Ewing LLP, located in Baltimore. The letter contains a signature of Katherine Hickey, an attorney at that firm. During the receivership, the law firm was contacted and indicated that it did not prepare the letter. Attorney Hickey did not state or provide any evidence that her signature was forged but the firm indicated that the letter did not come from it. Under these circumstances, there is no proof that the letter contains any of the defects required by Insuring Agreement (E), i.e., forged, altered, lost, stolen, or Counterfeit.

### *Actual Physical Possession*

The Bank never received actual physical possession of the Written Original of the letter. Accordingly, this requirement for coverage under Insuring Agreement (E) is not present.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 18

### d.  Standby Creditor's Agreements

The documents referenced in Mr. Haggard's letter as forged seller subordination agreements are the same documents identified in the proof of loss factual background letter as **Standby Creditor's Agreement with forged signature of Trakhtman** and **Standby Creditor's Agreement with forged signature of Sloan**. This analysis refers to the two documents as Standby Creditor's Agreements.

After payment with loan proceeds to purchase A&A and JCare, GMEA still owed the A&A seller, Mikhail Trakhtman, $500,000.00 and the seller of JCare, Debra Sloan, $325,000.00. The Standby Creditor's Agreements were to ensure that Trakhtman and Sloan agreed to not accept payment from GMEA for this debt until June, 2016 and to be otherwise subordinate to the Bank's loan and turn over any payment it may receive before June, 2016 to the Bank. The agreement that contains Trakhtman's signature states in pertinent part as follows:

> Global Medical Equipment of America, Inc. (Standby Borrower) owes $500,000.00 principal and interest to Michael Trahktman [sic] (Standby Creditor) as of the date of this Agreement (Standby Loan) (Copy of Standby Note attached). To induce Metro Phoenix Bank (Lender) to make an SBA guaranteed loan to Standby Borrower, Loan Number 52693950-09 in the amount of $3,631,000.00 (Lender's Loan), Standby Creditor agrees:
>
> 1.  To accept payments of principal and interest at the rate of 5.00% per annum beginning on June 29, 2016
> 2.  To turn over to Lender payments received by Standby Creditor from Standby Borrower in violation of this Agreement within 15 days of receipt.
> 3.  That the Standby Debt is and shall be subordinate to the Lender's Loan, and all other present and future indebtedness, obligations, liabilities, claims, rights and demands of any kind which may be now or hereafter guaranteed by or owing from borrower to Lender.
>
> To take no action to enforce claims against Standby Borrower on the Standby Loan until Lender's Loan is satisfied and paid in full.

The agreement that has Ms. Sloan's signature contains the same language but the loan amount is $325,000.00. Attached to each agreement is a "Standby Note" that is a promissory note from GMEA for the specific amount signed by Halman as President and CEO of GMEA.

### *Covered Document*

The Bank asserts in the proof of loss factual background letter that the Standby Creditor Agreements qualify as Security Agreements under Insuring Agreement (E). The letter states the agreements create "an interest in the Bank's favor in the standby creditor's [Trahktman's and Sloan's] right to payment." The bond defines a Security Agreement as a "Written agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." However, the agreements, standing alone, do not secure payment to the Bank on

Christopher L. LaVoy, Esq.
November 4, 2016
Page 19

the loan it gave to GMEA or to payment to Trahktman and Sloan. The agreements provide that Trahktman and Sloan will forego payment for the benefit of the Bank but do not in any way secure payment from GMEA on the SBA loan provided by the Bank or to Trahktman and Sloan on their promissory notes. For this reason, they are not Security Agreements as defined in the bond. Furthermore, the bond specifically provides that a forged document cannot be combined with another document not forged in order to trigger coverage as provided in the Anti-Bundling provision referred to above. The Standby Creditor's Agreements incorporate the promissory notes from GMEA to the Sellers, Trahktman and Sloan, which is subordinated to any payment GMEA has owing to the Bank. This is the interest the Bank claims creates an interest in its favor. Specifically, the factual background letter states' "the Standby Creditor's Agreement creates an interest in the Bank's favor in the standby creditor's right to payment" and "the standby creditor agrees to "turn over" to the Bank any payment that it receives from GMEA in violation for the Standby Creditor's Agreement." The promissory notes attached the agreements are not forged. The Standby Creditor's Agreements create no security interest without the promissory notes incorporated thereto. Thus, standing alone, the Standby Creditor's Agreements create no security agreement.

Because the Standby Creditor's Agreements, standing alone, do not secure payment of the loan to GMEA, they are not covered documents under Insuring Agreement (E).

### Written Original

The Standby Creditor's Agreements are Written as they were received on paper. Although the "blue ink" originals are contained in the Bank loan file it is unknown if the original was obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had actual physical possession prior to extending credit.

### Specified Defect

The agreements contain forged signatures. Trahktman and Sloan testified in deposition testimony in the Starfield litigation that they never agreed to the agreements, were unaware of them and that the signatures on the agreement were not theirs. Accordingly, the Bank can satisfy that the documents were forged.

### Actual Physical Possession

Although the "blue ink" originals are contained in the Bank loan file it is unknown if the original was obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had actual physical possession prior to extending credit.

### e.  Stock Certificates

To secure the loan, GMEA provided the Bank with stock certificates for the purchased A&A and JCare stock. The A&A certificate states that GMEA is the owner of 100 shares of A&A stock. It

Christopher L. LaVoy, Esq.
November 4, 2016
Page 20

is dated June 25, 2012 and is signed by Halman and Boates. The JCare certificate states that GMEA is the owner of 1000 shares of JCare and is dated June 25, 2012 and signed by Halman and Boates. The Bank claims that the Boates signature on each stock certificate appears to be forged based on a comparison to notarized exemplars of his signature. The A&A stock certificate also appears to be counterfeit because it lists GMEA as owning 100 shares of A&A stock even though it only purchased 90.

The Bank also presents two additional stock certificates for coverage under Insuring Agreement (E). GMEA provided copies of Schaap's and Boate's GMEA stock certificates. Schaap's stock certificate states that he is the owner of 8,050,000 shares of stock of GMEA. It is dated May 1, 2010 and is signed by Halman and Boates. The Boates certificate states that he is the owner of 1,905,000 shares of GMEA stock. It is dated May 1, 2010 and is signed by Halman and Schaap. The Bank maintains that the stock certificates are counterfeit because they misstate the number of shares that Schaap and Boates own.

### Covered Document

The Bank argues that all of the stock certificates qualify as a Certificated Security under Insuring Agreement (E). Certificated Security is defined in Section 1 of Conditions and Limitations of the Bond, Definitions, at subsection (c) as follows:

> Certificated Security means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer, which is:
>
> (1)   represented by a Written instrument issued in bearer or registered form;
>
> (2)   of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
>
> (3)   either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

The stock certificates are Written instruments in bearer form that evidence ownership in the stock identified. Each stock certificate appears to meet the definition of a Certificated Security as defined by the bond.

### Written Original

Both Written Originals of the **A&A stock certificate** and the **JCare stock certificate** are contained in the loan file that I examined. However, it is unknown if the original was obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had the Written Originals prior to extending credit.

With regard to the **GMEA stock certificate for Alexander Schaap** and the **GMEA stock certificate for Craig Boates**, the Bank did not have the Written Original at the time the credit was extended. Further, the Written Originals were not contained in the Bank's loan file that I examined.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 21

*Specified Defect*

The Bank claims that the Boates signature on the **A&A stock certificate** and on the **JCare stock certificate** "appears to be forged based on a comparison to notarized exemplars of his signature." The bond defines Forgery in Conditions and Limitations, Definitions, at Section 1(j) as follows:

(j)     Forgery means:

      (1)     affixing the handwritten signature, or a reproduction of the handwritten signature, of another natural person without authorization and with intent to deceive; or

      (2)     affixing the name of an organization as an endorsement to a check without authority and with the intent to deceive.

      Provided, however, that a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose is not a Forgery.   An electronic or digital signature is not a reproduction of a handwritten signature or the name of an organization.

Boates has not testified or provided an affidavit that his signature is forged. It is not known if he signed the documents and it is certainly not known if his name was signed without his authorization. Given that he was part of a scheme between the two other owners of GMEA to defraud the Bank it is more likely than not that he did authorize the signature even if he did not sign it. It is established that he provided other information that was false and designed to perpetrate the fraud against the Bank such as his letter indicating that there was no pending litigation against GMEA. Boates was part of and integral to the whole fraudulent scheme against the Bank. He also benefited from the fraud. There is no direct proof that his signatures on the stock certificates are forged. Further, if the signatures were signed by Halman, or someone else, it is clear that Boates, given his position in the scheme, authorized the signatures and he benefited by them. It is certainly clear that he ratified the signing as he undoubtedly knew that they were submitted to the Bank because he knew GMEA was claiming Halman was not an owner of GMEA when he was an owner.

The Bank claims the GMEA Stock Certificates for Alexander Schaap and the GMEA stock certificate for Craig Boates are counterfeits. The bond defines Counterfeit in Conditions and Limitations, Definitions, at Section 1(e) as follows:

(e)     Counterfeit means a Written imitation of an actual, valid Original which is intended to deceive and to be taken as the Original.

The GMEA Stock Certificates are not counterfeits. They are not imitations of actual, valid Originals. Instead, they were completely made up and fictitious as they did not indicate the real amount owned by Schaap and Boates. A counterfeit would be an imitation of a valid Original of the stock certificates reflecting the true ownership of Schaap and Boates in GMEA.

A specified defect has not been proven with regard to any of the stock certificates.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 22

### *Actual Physical Possession*

Although the "blue ink" originals of the A&A and JCare stock certificates are contained in the Bank loan file it is unknown if the originals were obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had actual physical possession prior to extending credit.

In addition to the above, the stock certificates are for stock in GMEA, JCare and A&A. Each entity is now insolvent or nonexistent. Insuring Agreement (E) provides that loss due to a forgery or alteration is covered "only to the extent the forgery or alteration causes the loss." The Bank would have experienced loss regardless of any forgery or alteration because the stock in GMEA, JCare and A&A was worthless as determined by the Receiver of GMEA. If the stock in the companies had value but the bank could not recover on them because of the forgery or alteration, coverage may have been triggered. However, because the stock in the companies has no value the forgeries and alterations did not cause the Bank's loan loss. Likewise, with any counterfeit, Insuring Agreement (E) requires the counterfeit cause the loss. The stock certificates are not counterfeits because they are not written imitations of actual, valid Originals. Rather, they are made up documents, not imitations of actual stock certificates that contained a correct amount of stock owned.

### C. **Other Applicable Bond Provisions**

While there is no coverage for this claim, given the information presented by the Bank in its proof of loss, the following exclusions and bond provisions bear mentioning because they impact on the amount of loss the Bank alleges:

Exclusion (s) is contained in Section 2 of Conditions and Limitations and states that the bond does not cover the following:

> Potential income, including but not limited to interest and dividends, not realized
> by the Insured.

The amount of loss presented by the Bank in the proof of loss contains potential income, including interest and fees, that is excluded from coverage.

Exclusion (u) is contained in Section 2 of Conditions and Limitations and states that the bond does not cover the following:

> all fees, costs and expenses incurred by the Insured
>
> (1)   in establishing the existence of or amount of loss covered under this bond, or
>
> (2)   as a party to any legal proceeding whether or not such legal proceeding
>       exposes the Insured to loss covered by this bond;

The proof of loss contains loss related to receivership fees and legal fees. These expenses are not covered by the bond.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 23

Exclusion (v) is contained in Section 2 of Conditions and Limitations and states that the bond does not cover the following:

> indirect or consequential loss of any nature including, but not limited to, fines, penalties, multiple or punitive damages;

Any claim for this type of loss is excluded.

Finally, Section 6 of the bond states as follows:

> The value of any loss for purposes of coverage under this bond shall be the net loss to the Insured after crediting any receipts, payments or recoveries, however denominated, received by the Insured in connection with the transaction giving rise to the loss. If the loss involves a Loan, any interest or fees received by the Insured in connection with the Loan shall be such a credit.

The Bank received payments and recoveries and accordingly all these amounts would reduce any loss that would be covered under the bond pursuant to Section 6.

## V. CONCLUSION

There is no coverage for the following reasons: 1) Notice of the discovery of the loss was provided after the expiration of the bond; 2) the documents presented by the Bank as being forged, altered or counterfeit do not meet the required elements for coverage under Insuring Agreement (E); and, 3) the forged, altered or counterfeit documents did not cause the loss.

The coverage position set forth above is based upon all presently available information. In the event that you believe that this position is incorrect, or that we have overlooked a relevant fact, we will reevaluate this matter on the basis of any additional documentation, factual information or applicable precedent which you submit. If you disagree with Everest's position or have a question or concern, please feel free to contact me.

No statement herein should be considered a waiver of any right, defense or privilege that Everest may have under the Bond or law, regardless of whether the provision has been noted herein.

Sincerely,

John Cullen
Senior Attorney

JLC:st

# Exhibit 4

|||ABA
|||Insurance
|||Services

ABA Insurance Services Inc.
5910 Landerbrook Drive, Suite 100
Mayfield Heights, Ohio 44124

www.abais.com
800 274 5222 T
800 456 6590 F

March 1, 2017

Christopher L. LaVoy, Esq.
Tiffany & Bosco, P.A.
Seventh Floor Camelback Esplanade II
2525 E Camelback Road
Phoenix, AZ 85016

***VIA EMAIL cal@tblaw.com AND REGULAR U.S. MAIL***

Re:    Insured:                              Metro Phoenix Bank
       Financial Institution Bond No.:       8100008898-131
       Claim No.:                            ABA0002377
       Matter:                               Global Medical Equipment of America

Dear Chris:

Thank you for your letter dated December 1, 2016 requesting Everest reconsider its position on this claim and thereafter providing supplemental argument and materials.

You indicate in your letter that the Bank had the "blue ink" originals of the two forged Standby Creditor's Agreements prior to providing the credit to Global Medical Equipment of America (GMEA). You provided emails from Alexander Schapp stating that he would be delivering the originals to the Bank on June 28, 2012 which was prior to the funding of the GMEA loan. In the November 4, 2016 letter setting forth Everest's position on coverage it is stated that it was unknown if the Bank had the originals at the time of funding. We appreciate you providing the emails that may indicate the originals were provided before the funding and, as the coverage letter stated, the originals are contained in the Bank's loan file that I reviewed.

However, even if the Bank had the originals prior to funding the GMEA loan, the Standby Creditor's Agreements are not Security Agreements as that term is defined in the Bond for the reasons explained in the November 4, 2016 coverage letter. The Standby Creditor's Agreements do not secure payment of the Bank loan to GMEA.

Your letter states that the Standby Creditor's Agreements would qualify, in addition, or alternatively, as Guarantees under the Bond. Your letter states they obligate Trahktman and Sloan to pay money to the Bank that would be credited to the Bank under Paragraph 2 of the Agreements. Paragraph 2 obligates Trahktman and Sloan "[t]o turn over to Lender [the Bank] payments received by [them] from [GMEA] in violation of [the] Agreement . . ."

The Bond defines Guarantee in Section 1(k) of Conditions and Limitations in pertinent part as follows:

Christopher L. LaVoy, Esq.
March 1, 2017
Page 2

> Guarantee means a Written undertaking obligating the signer to pay the debt of
> another, to the Insured . . . if the debt is not paid in accordance with its terms.

The Agreements do not obligate Trahktman and Sloan to pay GMEA's loan. It only obligates them to turn over any money they may receive from GMEA before the Bank's loan is paid. The Standby Creditor's Agreements do not obligate Trahktman and Sloan to pay the GMEA loan if GMEA defaults on the loan but only to accept payments after payment has been made to the Bank. The Bank has no rights to payment from Trahktman and Sloan under the Agreements in the event of GMEA's default. Your letter states that the Bond's definition of Guarantee does not require it to cover all borrower breaches and the entire loan debt. However, the Agreements do not require Trahktman and Sloan to pay any GMEA debt, only to turn over any payments it receives from GMEA to the Bank before GMEA's loan is paid. If the signatures of Trahktman and Sloan were genuine, the Agreements would not obligate them to pay the GMEA debt owed to the Bank and it is my understanding that there were no payments to Trahktman and Sloan that would have been collectible under the terms of the Agreements. For all these reasons, the Standby Creditor's Agreements are not Guarantees and are not covered documents under the Bond.

Whether the Bank had the "blue ink" originals of the Standby Creditor's Agreements prior to funding the loan does not change the coverage determination under the Bond because the Standby Creditor's Agreements are not Security Agreements or Guarantees under the Bond and therefore are not covered documents under Insuring Agreement E.

With regard to the late notice, your letter states that Arizona courts have adopted the "notice prejudice" rule. You cite the *Zuckerman* case that involved an occurrence fire policy. It is not clear that this case would apply to the Bond that provides coverage for claims made during the Bond Period and requires notice within 30 days. *The Maryland Casualty Co.* case that you cite involved a fidelity policy but notice was timely provided during the policy period. The ruling in the case was limited to the time required to provide a proof of loss to a carrier after timely notice. Metro Phoenix provided notice over two years after the Bank discovered the loss and after the Bond Period had expired. An Arizona court would likely find that prejudice is not required under these circumstances and accept the reasoning in *Sletten v. St. Paul Fire & Marine Ins. Co.*, 161 Ariz. 595, 780 P.2d 428 (Ct. App. 1989) and *Thoracic Cardiovascular Assocs., Ltd. v. St. Paul Fire & Marine Ins.* 181 Ariz. 449, 891 P.2d 916 (Ct. App. 1994) where the courts distinguished claims made policies to occurrence policies and found no prejudice is required when notice of a claim is provided after expiration of the policy period. Regardless of this, there is prejudice to Everest as outlined in the November 4, 2016 coverage letter. Notice was provided outside the Bond Period, two years after the loss was discovered. In the two years after the loss was discovered extensive litigation took place including discovery in the legal malpractice case and the Halman bankruptcy during which Everest had no ability to be informed or participate.

Everest finds no coverage for this claim under the bond for the foregoing reasons and for those set forth in the November 4, 2016 coverage letter. You have inquired about whether Everest is interested in negotiating a settlement or compromise with the Bank because it disagrees with Everest's position. Should the Bank wish to make a settlement demand we will certainly present

Christopher L. LaVoy, Esq.
March 1, 2017
Page 3

it to Everest for its consideration.

No statement herein should be considered a waiver of any right, defense or privilege that Everest may have under the Bond or law, regardless of whether the provision has been noted herein.

Sincerely,

John Cullen
Senior Attorney

JLC:st

Exhibit 2

# Exhibit 2



Skip To MainContent

[ ] [Search]

⚠ **ADVERTENCIA:** Estafa por medio de llamadas telefónicas y correo electrónico.  **Leer Mas...**

Civil Court Case Information - Case History

### Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2017-013705 | Judge: | Mullins, Karen |
| File Date: | 10/10/2017 | Location: | Downtown |
| Case Type: | Civil | | |

### Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| M P B Collection L L C | Plaintiff | | Christopher Lavoy |
| Everest National Insurance Company | Defendant | | Pro Per |

### Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 10/24/2017 | NOF - Notice Of Filing | 10/24/2017 | |
| NOTE: Notice of Filing Amended Civil Cover Sheet | | | |
| 10/16/2017 | AFS - Affidavit Of Service | 10/18/2017 | |
| NOTE: EVERST NATIONAL INSURANCE COMPANY | | | |
| 10/12/2017 | SUM - Summons | 10/16/2017 | |
| 10/10/2017 | COM - Complaint | 10/11/2017 | |
| 10/10/2017 | CCN - Cert Arbitration - Not Subject | 10/11/2017 | |
| 10/10/2017 | CSH - Coversheet | 10/11/2017 | |

### Case Calendar

There are no calendar events on file

### Judgments

There are no judgments on file

## Superior Court of Arizona
## In Maricopa County

**Case Number**

# CV2017-013705

MICHAEL K. JEANES, CLERK
BY. DEP

J. LEWIS, FILED

J. LEWIS, FILED

Is Interpreter Needed? ☐ Yes ☒ No 17 OCT 10 PM 3: 37

If yes, what language: _____

To the best of my knowledge, all information is true and correct.

**Plaintiff's Attorney:**
Christopher A. LaVoy

**Attorney's Bar Number:** 016609

**Attorney/Pro Per Signature (if no attorney, YOUR signature)**

Plaintiff's Name(s):  (List all)
MPB Collection LLC

Plaintiff's Address:
Tiffany & Bosco, P.A.

2525 East Camelback Road, Seventh Floor

Phoenix, Arizona 85016

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s):  (List all.)

Everest National Insurance Company

(List additional defendants on page two and/or attach a separate sheet).

EMERGENCY ORDER SOUGHT:
(if applicable)
☐ Temporary Restraining Order
☐ OSC – Order to Show Cause
☐ Employer Sanction
☐ Provisional Remedy
☐ Election Challenge
☐ Other _____

☒ RULE 8(i) COMPLEX LITIGATION DOES NOT APPLY.  (Mark appropriate box under **Nature of Action**).

☐ RULE 8(i) COMPLEX LITIGATION APPLIES    Rule 8(i) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties. (Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category).

## NATURE OF ACTION
(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**
☐ 101 Non-Death/Personal Injury
☐ 102 Property Damage
☐ 103 Wrongful Death
**110 TORT NON-MOTOR VEHICLE:**
☐ 111 Negligence
☐ 112 Product Liability – Asbestos
☐ 112 Product Liability – Tobacco
☐ 112 Product Liability – Toxic/Other
☐ 113 Intentional Tort
☐ 114 Property Damage
☐ 115 Legal Malpractice
☐ 115 Malpractice – Other professional
☐ 117 Premises Liability
☐ 118 Slander/Libel/Defamation
☐ 116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**
☐ 121 Physician M.D.  ☐ 123 Hospital
☐ 122 Physician D.O  ☐ 124 Other
**130 CONTRACTS:**
☐ 131 Account (Open or Stated)
☐ 132 Promissory Note
☐ 133 Foreclosure
☐ 138 Buyer-Plaintiff
☐ 139 Fraud
☒ 134 Other Contract (i.e. Breach of Contract)
☐ 135 Excess Proceeds - Sale
☐ Construction Defects (Residential/Commercial)
    ☐ 136 Six to Nineteen Structures
    ☐ 137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**

Case No. _____

☐ 156 Eminent Domain/Condemnation
☐ 151 Eviction Actions (Forcible and Special Detainers)
☐ 152 Change of Name
☐ 153 Transcript of Judgment
☐ 154 Foreign Judgment
☐ 158 Quiet Title
☐ 160 Forfeiture
☐ 175 Election Challenge
☐ 179 Employer Sanction Action (A.R.S. §23-212)
☐ 180 Injunction against Workplace Harassment
☐ 181 Injunction against Harassment
☐ 182 Civil Penalty
☐ 186 Water Rights **(Not General Stream Adjudication)**
☐ 187 Real Property
☐ Sexually Violent Persons (A.R.S. §36-3704)
   (Except Maricopa County)
☐ Minor Abortion (See Juvenile in Maricopa County)
☐ Special Action Against Lower Courts
   (See lower court appeal cover sheet in Maricopa)
☐ 194-Immigration Enforcement Challenge
   (§§1-501, 1-502, 11-1051)

**150-199 UNCLASSIFIED CIVIL CASE TYPES:**

☐ Notice of Appeal pursuant to A.R.S. § 12-904
   (formerly "Administrative Review")
   (Use lower court appeal cover sheet in Maricopa)
☐ 150 Tax Appeal
(All other tax matters must be filed in the AZ Tax Court)

☐ 155 Declaratory Judgment
☐ 157 Habeas Corpus
☐ 184 Landlord Tenant Dispute - Other
☐ 159 Restoration of Civil Rights (Federal)
☐ 159 Clearance of Records (A.R.S. §13-4051)
☐ 190 Declaration of Factual Innocence **(A.R.S.§12-771)**
☐ 191 Declaration of Factual Improper Party Status
☐ 193 Vulnerable Adult (A.R.S. §46-451)
☐ 165 Tribal Judgment
☐ 167 Structured Settlement (A.R.S. §12-2901)
☐ 169 Attorney Conservatorships (State Bar)
☐ 170 Unauthorized Practice of Law (State Bar)
☐ 171 Out-of-State Deposition for Foreign Jurisdiction
☐ 172 Secure Attendance of Prisoner
☐ 173 Assurance of Discontinuance
☐ 174 In-State Deposition for Foreign Jurisdiction
☐ 176 Eminent Domain–Light Rail Only
☐ 177 Interpleader– Automobile Only
☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
☐ 183 Employment Dispute - Discrimination
☐ 185 Employment Dispute - Other
☐ 195(a) Amendment of Marriage License
☐ 195(b) Amendment of Birth Certificate
☐ 163 Other

_____
(Specify)

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

☐ Antitrust/Trade Regulation
☐ Construction Defect with many parties or structures
☐ Mass Tort
☐ Securities Litigation with many parties
☐ Environmental Toxic Tort with many parties
☐ Class Action Claims
☐ Insurance Coverage Claims arising from the above-listed case types
☐ A Complex Case as defined by Rule 8(i) ARCP

Additional Plaintiff(s)

_____

_____

Additional Defendant(s)

_____

_____

©Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CV10f- 090213

MICHAEL K. JEANES, CLERK
BY
*J. Lewis*
J. LEWIS, FILED

**17 OCT 10 PM 3: 38**

1    Christopher A. LaVoy (016609)

2    **[IB] TIFFANY & BOSCO**
     P.A.

     SEVENTH FLOOR CAMELBACK ESPLANADE II
3    2525 EAST CAMELBACK ROAD
     PHOENIX, ARIZONA 85016B4237
     TELEPHONE: (602) 255-6000
4    FACSIMILE: (602) 255-0103
     E-MAIL: cal@tblaw.com
5    *Attorneys for plaintiff*

6              **SUPERIOR COURT OF ARIZONA**

7                 **MARICOPA COUNTY**

8    MPB Collection, LLC,              Case No.:  CV 2017-013705

9                        Plaintiff,    **CERTIFICATE OF COMPULSORY
                                        ARBITRATION**
10   v.

11   Everest National Insurance Company,

12                        Defendant.

13

14         The undersigned certifies that he knows the dollar limits and any other limitations

15   set forth by the local rules of practice for the applicable superior court, and further certifies

16   that this case is NOT subject to compulsory arbitration, as provided by Rules 72 through

17   77 of the Arizona Rules of Civil Procedure.

           DATED this 10th day of September, 2017.
18

19                               TIFFANY & BOSCO, P.A.

20                               By: _____

21                                    Christopher A. LaVoy
                                      Seventh Floor Camelback Esplanade II
22                                    2525 East Camelback Road
                                      Phoenix, Arizona 85016
23                                    *Attorneys for plaintiff*

24

25

26                                        1

MICHAEL K. JEANES, CLERK 
RECEIVED CCS
DOCUMENT DEPOSITORY

2017 OCT 12 PM 4: 20

FILED BY A. S. ROMERO

1 | Christopher A. LaVoy (016609)

2 | **TIFFANY & BOSCO**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
3 | 2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016B4237
TELEPHONE: (602) 255-6000
4 | FACSIMILE: (602) 255-0103
E-MAIL: cal@tblaw.com
5 | *Attorneys for plaintiff*

**ORIGINAL**

6 | ### SUPERIOR COURT OF ARIZONA

7 | ### MARICOPA COUNTY

8 | MPB Collection, LLC,  |  Case No.: CV 2017-013705

9 |   Plaintiff,

10 |  |  **SUMMONS** 
v.  |  If you would like legal advice from a lawyer, contact the Lawyer Referral Service at

11 |  |  302-257-4434

12 | Everest National Insurance Company,  |  or
www.maricopalawyers.org

13 |   Defendant.  |  Sponsored by the Maricopa County Bar Association

### THE STATE OF ARIZONA TO THE FOLLOWING DEFENDANT:

### Everest National Insurance Company

**YOU ARE HEREBY SUMMONED** and required to appear and defend, within the time applicable, to this action in this Court. If served within Arizona, you shall appear and defend within 20 days after the service of the Summons and Complaint upon you, exclusive of the date of service. If served out of the State of Arizona, whether by direct service, by registered or certified mail, or by publication, you shall appear and defend within 30 days after the service of the Summons and Complaint upon you is complete, exclusive of the date of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be required to appear, answer or plead until expiration of 40 days after date of such service upon the Director. Service by registered or certified mail without the

1

1  State of Arizona is complete 30 days after the date of filing the receipt and affidavit of

2  service with the court. Service by publication is complete 30 days after the date of first

3  publication. Direct service is complete when made. Service upon the Arizona Motor

4  Vehicle Superintendent is complete 30 days after filing the Affidavit of Compliance and

5  return receipt or Officer's Return. Ariz. R. Civ. P. 4; A.R.S. §§ 20-222, 28-502 and 28-

6  503.

7       **YOU ARE HEREBY NOTIFIED** that in case of your failure to appear and defend

8  within the time applicable, judgment by default may be rendered against you for the relief

9  demanded in the Complaint.

10      **YOU ARE HEREBY NOTIFIED** that requests for reasonable accommodation for

11 persons with disabilities must be made to the division assigned to the case by parties at

12 least 3 judicial days in advance of a scheduled court proceeding.

13      **YOU ARE CAUTIONED** that in order to appear and defend, you must file an

14 Answer or proper response in writing with the Clerk of this Court, accompanied by the

15 necessary filing fee, within the time required, and you are required to serve a copy of any

16 Answer or response upon the Plaintiff's attorney. Ariz. R. Civ. P. 5, 10(D); A.R.S. § 12-

17 311.

18          The name and address of Plaintiff's attorney is:

19              Christopher A. LaVoy
20              TIFFANY & BOSCO, P.A.
                Seventh Floor Camelback Esplanade II
21              2525 East Camelback Road
                Phoenix, Arizona 85016-4237
22      **SIGNED AND SEALED** this date:  OCT **1 0** 2017

23      MICHAEL K. JEANES, CLERK MARICOPA COUNTY SUPERIOR COURT

24
                            By
25                                    Deputy Clerk
                                      J. Lewis
26                                    **Deputy Clerk**
                            2

Christopher A. LaVoy (016609)

**TIFFANY & BOSCO**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016B4237
TELEPHONE: (602) 255-6000
FACSIMILE: (602) 255-0103
E-MAIL: cal@tblaw.com

*Attorneys for plaintiff*

MICHAEL K. JEANES
Clerk of the Superior Court
By Joan Lewis, Deputy
Date 10/10/2017 Time 15:37:52
Description                    Amount
------ -- CASE# CV2017-013705 --------
CIVIL NEW COMPLAINT            322.00

TOTAL AMOUNT                   322.00
          Receipt# 26203140

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

| | |
|---|---|
| MPB Collection, LLC, | Case No.: CV 2017-013705 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Everest National Insurance Company, | |
| Defendant. | |

For its complaint, plaintiff alleges as follows:

### THE PARTIES, JURISDICTION AND VENUE

1.     Plaintiff MPB Collection, LLC ("MPB") is an Arizona limited liability company. MPB's sole member and manager is Metro Phoenix Bank, Inc. (the "Bank"). The Bank is an Arizona corporation with its principal place of business in Phoenix, Arizona. The Bank has assigned all rights and interest in the subject insurance claim to MPB for collection.

2.     Defendant Everest National Insurance Company ("Everest") is, upon information and belief, a Delaware corporation domiciled in that state.

3.     This Court has subject matter jurisdiction because the amount demanded exceeds $1,000. *See* Ariz. Const., art. 6 § 14.

1

1    4.    Venue is proper in Maricopa County because the events underlying this suit

2  occurred within the county. *See* A.R.S. § 12-401(7).

3                                   **FACTUAL BACKGROUND**

4                                      *GMEA's Loan Fraud*

5    5.    The Bank made an approximate $3.6 million SBA loan to Global Medical

6  Equipment of America ("GMEA") in mid-2012 (the "Loan").

7    6.    The purpose of the Loan was to fund GMEA's purchase of two companies—

8  A & A Medical Supply Company ("A & A") and JCare Home Medical Supplies, Inc.

9  ("JCare")—by stock purchase, as well as to pay off an existing SBA loan that GMEA had

10 through another bank.

11   7.    GMEA had entered into separate stock purchase agreements with Michael

12 Trakhtman for the A & A stock and with Debra Sloan for the JCare stock.

13   8.    Both the stock-purchase transactions and the Loan closed on or about June

14 28, 2012, which is when the Bank funded the Loan.

15   9.    Approximately one year later, in July 2013, GMEA defaulted on the Loan

16 by failing to make required payments.

17   10.   In December 2013, the Bank sued GMEA in the Superior Court of Arizona,

18 Maricopa County, Case No. CV2013-016955.

19   11.   The Bank applied for the appointment of a receiver over GMEA, which the

20 Court granted in early 2014.

21   12.   In the course of investigating GMEA's financial affairs, the receiver

22 discovered evidence suggesting that GMEA obtained the Loan through fraud. This

23 prompted further discovery confirming that GMEA had defrauded the Bank by *inter alia*:

24        • Overstating the purchase prices of A & A and JCare to obtain a larger loan

25           so that GMEA's principals could pocket the extra money;

26                                              2

- Misrepresenting that GMEA was paying $480,000 of its own money towards the purchase of A & A and JCare;
- Misrepresenting that GMEA was purchasing 100% of A & A's shares when it was only purchasing 90%;
- Misrepresenting the share-ownership percentages of GMEA's owners; and
- Forging signatures on Loan documents.

13.    The forged Loan documents included Standby Creditor's Agreements purportedly signed by Trakhtman and Sloan, the sellers of the A & A and JCare stock respectively.

14.    A Standby Creditor's Agreement is an SBA loan document used to restrict the borrower's ability to pay other creditors while repaying the SBA loan. It conserves the borrower's cash flow for the benefit of the lender. The "Standby Borrower" is the SBA borrower and the "Standby Creditor" is the borrower's other creditor (not the lender).

15.    As a condition of making the Loan, the Bank required that both Trakhtman and Sloan execute a Standby Creditor's Agreement prohibiting them from accepting additional stock-purchase payments from GMEA prior to June 29, 2016. This would make them Standby Creditors. In the event GMEA made additional payments to them prior to such date, Trakhtman and Sloan were obligated under the Standby Creditor's Agreements to "turn over" such payments to the Bank.

16.    Trakhtman's and Sloan's signatures on the Standby Creditor's Agreements were forged.

17.    True and correct copies of the forged Standby Creditor's Agreements for Trakhtman and Sloan are attached as Exhibits 1 and 2 respectively.

18.    Upon information and belief, GMEA made additional stock-purchase payments to Trakhtman and Sloan prior to June 29, 2016 in violation of the Standby

3

1 Creditor's Agreements, which Trakhtman and Sloan received and did not turn over to the
2 Bank.

3      19.    While the Bank discovered the basic outline of GMEA's fraud in early
4 2014, it did not discover that Trakhtman's and Sloan's signatures on the Standby
5 Creditor's Agreements were forged until early 2016.

6                   ***The Bank's Insurance Claim***

7      20.    Everest issued Financial Institution Bond, Bond No. 8100008898-131, to
8 the Bank for the bond period May 22, 2013 through May 22, 2014, which was amended to
9 terminate on October 24, 2014 (the "2013/2014 Bond").

10      21.    Everest issued Financial Institution Bond, Bond No. 8100008898-141, to
11 the Bank for the bond period October 24, 2014 through October 24, 2017 (the "2014/2017
12 Bond").

13      22.    On March 1, 2016, the Bank submitted a claim to Everest to recover the
14 Loan loss under Insuring Agreement (E) of the bonds (the "Insurance Claim").

15      23.    Insuring Agreement (E) generally covers loss resulting directly from the
16 Bank's reliance on certain types of forged or counterfeit documents in making a loan. The
17 covered document types are:

18           (a) Certificated Security,

19           (b) Document of Title,

20           (c) deed, mortgage or other instrument conveying title to, or creating or
               discharging a lien upon, real property,

21           (d) Certificate of Origin or Title,

22           (e) Certificate of Deposit,

23           (f) Evidence of Debt,

24           (g) corporate, partnership or personal Guarantee, or

25           (h) Security Agreement

26

24.     The forged Standby Creditor's Agreements qualify as a "Security Agreement" under Insuring Agreement (E). The bonds define a "Security Agreement" as "a Written agreement which creates an interest in personal property . . . which secures payment . . . of an obligation." GMEA's payments to Trakhtman and Sloan were their "personal property." The Standby Creditor's Agreements (assuming they had been signed) granted the Bank an "interest" in those payments, specifically a turn-over right. An "interest" is simply a legal right in property—the Bank's right to have the payments turned over to it constituted an "interest" in those payments that was security for the Loan. The Standby Creditor's Agreements thus meet the definition of a "Security Agreement."

25.     If the turn-over right does not create an "interest" in the payments, it at least creates an obligation by Trakhtman and Sloan (assuming they had signed) to pay the Bank an amount equal to the payments they received towards GMEA's debt to the Bank. This meets the definition of a "Guarantee," which is a covered instrument under Insuring Agreement (E). The bonds define "Guarantee" as "a Written undertaking obligating the signer to pay the debt of another, to the Insured . . . , if the debt is not paid in accordance with its terms." GMEA violated the Loan documents when it paid Trakhtman and Sloan prior to January 29, 2016, triggering an obligation by them to pay an amount equal to the payments to the Bank towards GMEA's debt, which amounts to a "Guarantee." Put differently, had they signed, Trakhtman and Sloan would have agreed to answer for the debt of another to the extent of the payments. A "Guarantee" does not have to be for the entirety of a debt, but can be for part of it, as here.

26.     The Bank extended credit on the faith of and relied on the Standby Creditor's Agreements.

27.     The Bank would not have made the Loan without Standby Creditor's Agreements signed by Trahktman and Sloan.

5

28.    The Bank had actual physical possession of a "Written, Original" of each of the Standby Creditor's Agreements before funding the Loan.

29.    Trahktman's and Sloan's signatures on the Standby Creditor's Agreements were forged.

30.    Trahktman's and Sloan's signatures were material to the validity or enforceability of the Standby Creditor's Agreements.

31.    The forging of the Standby Creditor's Agreements caused the Loan loss because the Bank relied on the authenticity of the documents in disbursing funds and prevented the Bank from recovering GMEA's payments to Trahktman and Sloan.

32.    The Bank's Loan loss exceeds the bonds' $2 million limit of liability.

33.    The bonds state that the Bank shall give notice of the loss within 30 days after discovery. Discovery occurs when an Executive Officer first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by the bond has been or will be incurred.

34.    The relevant discovery date is not when the Bank discovered the fraud generally, but when an Executive Officer discovered the *covered* portion of the fraud, *i.e.*, when the Executive Officer developed actual or constructive knowledge that Trahktman's and Sloan's signatures on the Standby Creditor's Agreements were forged.

35.    The Bank did not discover such signatures were forged until early 2016, within 30 days prior to the Bank giving notice to Everest.

36.    To the extent the Bank did not give timely notice, the notice-prejudice rule applies and Everest suffered no prejudice from the delay.

37.    The Standby Creditor's Agreements otherwise satisfies all conditions and requirements for coverage under Insuring Agreement (E).

38.    Everest denied coverage for the Standby Creditor's Agreements.

6

39.  True and correct copies of Everest's denial letters are attached as Exhibits 3 and 4.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

40.  Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

41.  Everest breached one or both of the bonds by denying coverage for the Loan loss under Insuring Agreement (E) based on the forged Standby Creditor's Agreements.

42.  The Bank suffered damages from such breach, specifically the balance due on the Loan which exceeds the bonds' limit of liability.

43.  MPB is entitled to recovery on the Bank's behalf pursuant to the Bank's assignment of the Insurance Claim to MPB.

## DEMAND FOR JURY TRIAL

44.  MPB requests a trial by jury of all issues so triable.

## REQUEST FOR AWARD OF ATTORNEYS' FEES

45.  MPB requests an award of its reasonable attorneys' fees incurred in this action pursuant to A.R.S. § 12-341.01. The contracts out of which this action arises are the Bonds.

WHEREFORE, MPB prays for judgment against Everest as follows:

A.  For an award of compensatory, consequential, special, and all other damages and restitution needed to make it whole;

B.  For an award of its costs and attorneys' fees incurred in this action;

C.  For an award of pre-judgment and post-judgment interest; and

D.  For such other and further relief as needed to provide a complete remedy.

. . .

. . .

7

1  DATED this 10th day of October, 2017.

2  TIFFANY & BOSCO, P.A.

3

4  By: _____
    Christopher A. LaVoy

5  Seventh Floor Camelback Esplanade II
   2525 East Camelback Road

6  Phoenix, Arizona 85016

7  *Attorneys for plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

8

# Exhibit 1

# STANDBY CREDITOR'S AGREEMENT

| SBA Loan # | 52693950-09 |
|---|---|
| SBA Loan Name | Global Medical Equipment of America, Inc. |
| Standby Creditor | Debra Sloan |
| Standby Borrower | Global Medical Equipment of America, Inc. |
| Lender | Metro Phoenix Bank |

Global Medical Equipment of America, Inc. (Standby Borrower) owes $325,000.00 principal and interest to Debra Sloan (Standby Creditor) as of the date of this Agreement (Standby Loan) (Copy of Standby Note attached).  To induce Metro Phoenix Bank (Lender) to make an SBA guaranteed loan to Standby Borrower, Loan Number 52693950-09 in the amount of $3,631,000.00 (Lender's Loan), Standby Creditor agrees: *(Check only one box)*

1.  ☐ To accept no further payments on the Standby Loan until Lender's Loan is satisfied.

    ☐ To accept interest only payments at a rate of ____ % per annum (no principal payments) on the Standby Loan until Lender's Loan is satisfied or until notified by Lender to stop accepting payments.

    ☐ To accept payments of principal and interest at the rate of ____ % per annum on the Standby Loan unless notified by Lender to stop accepting payments.

    ☒ To accept payments of principal and interest at the rate of 5.00% per annum beginning on June 29, 2016.

2.  To turn over to Lender payments received by Standby Creditor from Standby Borrower in violation of this Agreement within 15 days of receipt.

3.  That the Standby Debt is and shall be subordinate to Lender's Loan, and all other present and future indebtedness, obligations, liabilities, claims, rights and demands of any kind which may be now or hereafter guaranteed by or owing from Borrower to Lender.

4.  To take no action to enforce claims against Standby Borrower on the Standby Loan until Lender's Loan is satisfied and paid in full.

5.  Any and all liens and security interests of Standby Creditor in the now existing or hereafter acquired real

property and/or personal property of Borrower (collectively, the "Collateral") shall be and hereby are subordinated for all purposes and in all respects to the liens and security interests of Lender in the Collateral, regardless of the time, manner or order of perfection of any such liens and security interests and regardless of any failure, whether intervening or continuing, of Lender's liens to be perfected liens.

6.  To take no action against Standby Borrower's collateral, or any other collateral securing the Standby Loan, without written consent from the Lender, until Lender's Loan is satisfied and paid in full.

7.  Lender, in its sole discretion, may take any action without affecting this Agreement, including but not limited to the following:
    a. Modify the terms of Lender's Loan.
    b. Grant an extension or renewal of Lender's Loan.
    c. Defer payments or enter into a workout agreement on Lender's Loan.
    d. Release or substitute collateral securing Lender's Loan.
    e. Forbear from collecting on existing collateral or requiring additional collateral.
    f. Declare a default on Lender's Loan and notify Standby Creditor to stop accepting payments.
    g. Agree to release, compromise, or settlement of Lender's Loan.

8.  This Agreement applies to any successor to the Standby Creditor or assignee of this Agreement or of the Standby Note, including any bankruptcy trustee or receiver or guarantors or sureties of the Standby Note.

9.  Additional Loans made by Standby Creditor will be subject to the terms of this Agreement, unless Lender agrees otherwise in writing.

Dated: _____6/28_____, 2012

Standby Creditor:

Debra Sloan, Individually

## EXHIBIT A

STANDBY NOTE
(See Attached)

METROPHX-002891

## PROMISSORY NOTE

**$325,000.00**                                                                 **March 31, 2012**

FOR VALUE RECEIVED, the undersigned, Global Medical Equipment of America, of 23025 N. 15th Avenue, Unit 106, Phoenix, AZ 85027 promises to pay to the order of Debra Sloan ("Holder") at such place as designated in writing by Holder designated, the sum of **$325,000.00** as follows:  monthly interest only payments at the interest rate of five percent (5%) per year and the balance on or before the five year anniversary of this agreement.

All or any part of the aforesaid sum may be prepaid at any time and from time to time without penalty.

In the event of any default by the undersigned in any payment when due or in the event of the suspension of actual business, insolvency, assignment for the benefit of creditors, adjudication of bankruptcy, or appointment of a receiver, of or against the undersigned, the unpaid balance of the principal sum of this promissory note shall at the option of the holder become immediately due and payable.

The maker and all other persons who may become liable for the payment hereof severally waive demand, presentment, protest, notice of dishonor or nonpayment, notice of protest, and any and all lack of diligence or delays in collection which may occur, and expressly consent and agree to each and any extension or postponement of time of payment hereof from time to time at or after maturity or other indulgence, and waive all notice thereof.

In case suit or action is instituted to collect this note, or any portion hereof, the maker promises to pay such additional sum, as the court may adjudge reasonable, attorneys' fees in said proceedings.

This note is made and executed under, and is in all respects governed by, the laws of the State of Arizona on this ___ day of March 2012

**Global Medical Equipment of America, Inc.**

By _____

Harold Halman, II, President and CEO

06/26/2012 15:59 FAX                                                                      ☑0005/0005

## PROMISSORY NOTE

**$325,000.00**                                                              **March 31, 2012**

FOR VALUE RECEIVED, the undersigned, Global Medical Equipment of America, of 23025 N. 15th Avenue, Unit 106, Phoenix, AZ 85027 promises to pay to the order of Debra Sloan ("Holder") at such place as designated in writing by Holder designated, the sum of **$325,000.00** as follows: monthly interest only payments at the interest rate of five percent (5%) per year and the balance on or before the five year anniversary of this agreement.

All or any part of the aforesaid sum may be prepaid at any time and from time to time without penalty.

In the event of any default by the undersigned in any payment when due or in the event of the suspension of actual business, insolvency, assignment for the benefit of creditors, adjudication of bankruptcy, or appointment of a receiver, of or against the undersigned, the unpaid balance of the principal sum of this promissory note shall at the option of the holder become immediately due and payable.

The maker and all other persons who may become liable for the payment hereof severally waive demand, presentment, protest, notice of dishonor or nonpayment, notice of protest, and any and all lack of diligence or delays in collection which may occur, and expressly consent and agree to each and any extension or postponement of time of payment hereof from time to time at or after maturity or other indulgence, and waive all notice thereof.

In case suit or action is instituted to collect this note, or any portion hereof, the maker promises to pay such additional sum, as the court may adjudge reasonable, attorneys' fees in said proceedings.

This note is made and executed under, and is in all respects governed by, the laws of the State of Arizona on this ___ day of March 2012

**Global Medical Equipment of America, Inc.**

By _____

Harold Halman, II, President and CEO

METROPHX-002893

# Exhibit 2

# STANDBY CREDITOR'S AGREEMENT

| SBA Loan # | 52693950-09 |
| --- | --- |
| SBA Loan Name | Global Medical Equipment of America, Inc. |
| Standby Creditor | Michael Trahktman |
| Standby Borrower | Global Medical Equipment of America, Inc. |
| Lender | Metro Phoenix Bank |

Global Medical Equipment of America, Inc. (Standby Borrower) owes $500,000.00 principal and interest to Michael Trahktman (Standby Creditor) as of the date of this Agreement (Standby Loan) (Copy of Standby Note attached). To induce Metro Phoenix Bank (Lender) to make an SBA guaranteed loan to Standby Borrower, Loan Number 52693950-09 in the amount of $3,631,000.00 (Lender's Loan), Standby Creditor agrees: *(Check only one box)*

1.  ☐ To accept no further payments on the Standby Loan until Lender's Loan is satisfied.

    ☐ To accept interest only payments at a rate of ____ % per annum (no principal payments) on the Standby Loan until Lender's Loan is satisfied or until notified by Lender to stop accepting payments.

    ☐ To accept payments of principal and interest at the rate of ____ % per annum on the Standby Loan unless notified by Lender to stop accepting payments.

    ☒ To accept payments of principal and interest at the rate of 5.00% per annum beginning on June 29, 2016.

2.  To turn over to Lender payments received by Standby Creditor from Standby Borrower in violation of this Agreement within 15 days of receipt.

3.  That the Standby Debt is and shall be subordinate to Lender's Loan, and all other present and future indebtedness, obligations, liabilities, claims, rights and demands of any kind which may be now or hereafter guaranteed by or owing from Borrower to Lender.

4.  To take no action to enforce claims against Standby Borrower on the Standby Loan until Lender's Loan

{00511315;v1}                                                                                   Page 1/3

METROPHX-002873

is satisfied and paid in full.

5.  Any and all liens and security interests of Standby Creditor in the now existing or hereafter acquired real property and/or personal property of Standby Borrower (collectively, the "Collateral") shall be and hereby are subordinated for all purposes and in all respects to the liens and security interests of Lender in the Collateral, regardless of the time, manner or order of perfection of any such liens and security interests and regardless of any failure, whether intervening or continuing, of Lender's liens to be perfected liens.

6.  To take no action against Standby Borrower's collateral, or any other collateral securing the Standby Loan, without written consent from the Lender, until Lender's Loan is satisfied and paid in full.

7.  Lender, in its sole discretion, may take any action without affecting this Agreement, including but not limited to the following:
    a. Modify the terms of Lender's Loan.
    b. Grant an extension or renewal of Lender's Loan.
    c. Defer payments or enter into a workout agreement on Lender's Loan.
    d. Release or substitute collateral securing Lender's Loan.
    e. Forbear from collecting on existing collateral or requiring additional collateral.
    f. Declare a default on Lender's Loan and notify Standby Creditor to stop accepting payments.
    g. Agree to release, compromise, or settlement of Lender's Loan.

8.  This Agreement applies to any successor to the Standby Creditor or assignee of this Agreement or of the Standby Note, including any bankruptcy trustee or receiver or guarantors or sureties of the Standby Note.

9.  Additional Loans made by Standby Creditor will be subject to the terms of this Agreement, unless Lender agrees otherwise in writing.

Dated:    6/28    , 2012

Standby Creditor:

Michael Trakhtman, Individually

METROPHX-002874

**EXHIBIT A**

STANDBY NOTE
(See Attached)

METROPHX-002875

@0005/0005

06/25/2012 09:06 FAX

## PROMISSORY NOTE

**$500,000.00**                                                          **March 31, 2012**

FOR VALUE RECEIVED, the undersigned, Global Medical Equipment of America, of 23025 N. 15th Avenue, Unit 106, Phoenix, AZ 85027 promises to pay to the order of Michael Trahktman ("Holder")  at such place as designated in writing by Holder designated, the sum of $500,000.00 as follows:  monthly interest only payments at the interest rate of five percent (5%) per year and the balance on or before the five year anniversary of this agreement.

All or any part of the aforesaid sum may be prepaid at any time and from time to time without penalty.

In the event of any default by the undersigned in any payment when due or in the event of the suspension of actual business, insolvency, assignment for the benefit of creditors, adjudication of bankruptcy, or appointment of a receiver, of or against the undersigned, the unpaid balance of the principal sum of this promissory note shall at the option of the holder become immediately due and payable.

The maker and all other persons who may become liable for the payment hereof severally waive demand, presentment, protest, notice of dishonor or nonpayment, notice of protest, and any and all lack of diligence or delays in collection which may occur, and expressly consent and agree to each and any extension or postponement of time of payment hereof from time to time at or after maturity or other indulgence, and waive all notice thereof.

In case suit or action is instituted to collect this note, or any portion hereof, the maker promises to pay such additional sum, as the court may adjudge reasonable, attorneys' fees in said proceedings.

This note is made and executed under, and is in all respects governed by, the laws of the State of Arizona on this ___ day of March 2012

**Global Medical Equipment of America, Inc.**

By _____
   Harold Halman, II, President and CEO

METROPHX-002876

# Exhibit 3

ABA
Insurance
Services

ABA Insurance Services Inc.                    www.abais.com
5910 Landerbrook Drive, Suite 100              800 274 5222 T
Mayfield Heights, Ohio 44124                   800 456 6590 F

November 4, 2016

Christopher L. LaVoy, Esq.
Tiffany & Bosco, P.A.
Seventh Floor Camelback Esplanade II
2525 E Camelback Road
Phoenix, AZ 85016

### *VIA EMAIL cal@tblaw.com AND REGULAR U.S. MAIL*

Re:   Insured:                              Metro Phoenix Bank
      Financial Institution Bond No.:       8100008898-131
      Claim No.:                            ABA0002377
      Matter:                               Global Medical Equipment of America

Dear Mr. LaVoy:

As you know, ABA Insurance Services Inc. provides third party claims administration on behalf
of Everest National Insurance Company ("Everest"). As such, we received the Proof of Loss
which was submitted by the Metro Phoenix Bank (hereinafter referred to as "Bank") to Everest.

After a careful review of all the documentation and facts supplied to ABA Insurance Services Inc.
as well as the in person interviews conducted in connection with this matter, Everest must decline
coverage for the Bank's claim. Our reasoning for this decision is set forth below.

## I.    FACTS

*Global Medical Equipment of America, Inc.*

Global Medical Equipment of America, Inc. (GMEA) was a Phoenix based corporation that was
formed in early 2010 as a holding company focusing on durable and home medical equipment
products. It owned and operated Medicare accredited retail stores in five states as well as a
wholesale division. These types of stores have been traditionally owned locally as proprietorships
or S corps to sell devices such as wheelchairs, crutches, walkers, catheters, lift chairs, CPAP
machines, bedpans, colostomy bags, feeding tubes, hospital beds, prosthetic devices, etc., that are
used for patients whose care is being managed from a home or other private facility managed by
nonprofessional caregivers or family members. Most purchases are completed with a medical
doctor's prescription and receive reimbursement from private health insurance or Medicare which
is why it is crucial for such stores to be Medicare accredited.

GMEA's business plan sought to aggressively expand by acquiring existing, locally owned,
Medicare certified and accredited stores in the top 20 demographic regions with elderly and baby
boomer populations. A network of acquired retail stores would then be complemented with three
wholesale distribution centers strategically located to cover the entire US market.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 2

GMEA had six retail stores in five states (Arizona, Washington, Louisiana, Florida and Virginia) in 2012 when it approached the Bank to obtain funding to purchase two additional stores: A & A Medical (A&A) in Baltimore and JCare Medical (JCare) in Chicago. The purchase of the stores was consistent with the business plan in that the two stores were Medicare accredited and increased the national GMEA footprint by two additional states.

### GMEA Loan from the Bank

GMEA represented to the Bank that the purchase price for JCare was $1,125,000 and the price for A&A was $2,500,000. The proposal was to obtain a purchase loan from the Bank under the Small Business Administration (SBA) 7(a) Loan Program that is authorized by Section 7(a) of the Small Business Act of 1953, 15 U.S.C. § 636(a). Under this program, the SBA guarantees 75% of the loan amount. The proposed GMEA loan was to be collateralized by interest in the GMEA business rather than with real estate or other collateral.

GMEA was not a customer of the Bank and it had an existing SBA guaranteed loan in the amount of approximately $1,620,000 from RepublicBank AZ. After discussions between GMEA and the Bank in May and June, 2012, it was decided that a loan proposal would be submitted for SBA authorization for the total amount required to purchase A&A and JCare and to pay off the RepublicBank AZ loan. The payoff of the RepublicBank AZ loan would allow the Bank to have a first priority on its liens of GMEA stock and assets. A condition of the loan would be a required capital injection of $600,000. The SBA always requires an equity injection on a 7(a) loan. The SBA would not have guaranteed the loan if it was not made and the Bank could not and would not have made the loan if the SBA did not guarantee it.

A loan application was submitted to the SBA on 06/12/2012. The application was signed by Harold Halman, President and CEO of GMEA, Alexander Schaap, who was the company's CFO, and Craig Boates, the company's general counsel. It was represented to the Bank that Schapp was the majority owner holding 80.5% of GMEA stock and Boates owned 19.5%. Halman and Schaap committed to providing the $600,000 capital injection as an equity investment. The equity injection was to fund a portion of the purchase prices of JCare and A&A.

On 06/18/2012, the SBA provided an Authorization for the loan in the amount of $3,929,500.00. The Authorization required the loan proceeds be used to 1) purchase all outstanding stock of A&A and JCare; 2) pay off the RepublicBank AZ loan; and, 3) pay the SBA guarantee fee. The SBA Authorization had many other conditions including properly securing the loan and ensuring that the required capital injection is properly made.

### Loan Closing and Retention of Starfield & Smith, P.C.

In anticipation of receiving SBA authorization of the loan, the Bank retained the law firm of Starfield & Smith, P.C. (Starfield) to ensure a properly documented and secured loan that complied with the conditions contained in the Authorization and the SBA's standard operating procedures. The GMEA loan was a large and complex loan for the Bank. Without the SBA guarantee, the Bank would not have been eligible to fund the loan. The loan was especially complex because it required closing the loan in Arizona as well as closing the purchases of two operating business in two other

Christopher L. LaVoy, Esq.
November 4, 2016
Page 3

states by GMEA using a substantial portion of the loan proceeds. The loan presented special risk because it was to be collateralized only by commercial-business collateral rather than real estate.

According to the Bank, Starfield agreed to assume due-diligence responsibility regarding the equity injection and UCC searches. Further, Starfield agreed to consult with and guide the Bank through the steps required to close the loan; to protect the Bank's SBA guaranty; and, to satisfy the steps required to close the loan. This, according to the Bank, included Starfield doing the following: preparing closing settlement statements; gathering, investigating, and reviewing the documents needed to close the loan including the portion of the transaction relating to the out-of-state purchases of A&A and JCare; determining that GMEA satisfied the requirements of the loan documents; verifying the absence of adverse litigation and liens that could impair the Bank's security on the loan or impair GMEA's ability to pay the loan; ensuring that GMEA had provided all documents needed to comply with the loan documents; communicating with GMEA management and third parties as needed; investigating potential irregularities in the loan requirements; consulting and advising the Bank throughout the loan process; and distributing the loan proceeds. To ensure Starfield had complete control over whether the loan closed in accordance with the SBA's procedures and conditions, Starfield agreed to act as the escrow agent for the loan.

The loan was completed for the final, total amount of $3,631,000.00 and a note was executed on 06/28/2012. The closing involved the purchasing of JCare and A&A and payoff of the RepublicBank AZ loan.

<em>Default, Receivership and Discovery of Fraud</em>

GMEA failed to make payments that were due on the note on 07/05/2013 and every subsequent month with the exception of two payments on 12/05/2013. These later payments did not cure the default and the Bank, pursuant to its rights under the note, filed suit in Maricopa County, Arizona, Superior Court and on 01/10/2014 obtained an order placing GMEA in receivership.

Through the receivership, the Bank obtained access to GMEA's server and computer hard drives. A search of the server and hard drives identified that documents provided by GMEA to the Bank to obtain the loan were fraudulent. It was essentially found that many of the documents, such as the original JCare and A&A purchase contracts had been altered to show higher purchase prices for the two entities than was agreed to presumably in order to obtain a larger loan and use the proceeds for something other than the purchase prices. The purchase contract the Bank was provided listed the purchase price of JCare as $1,125,000.00. The actual price agreed to was $850,000.00 and this amount was contained in the agreement signed by the seller Debra L. Sloan and verified by her as being the actual price.[1] Someone at GMEA altered the agreement to the higher price and gave this altered document to the Bank for purposes of obtaining the loan. With A&A, the agreed price, as verified by the seller, Mikhail Trakhtman, was $2,000,000.00, the agreement provided to the Bank was altered to list the price as $2,500,000.00.

---

[1] Counsel for the Bank discovered this on copies of the actual purchase agreements saved on the hard drives of the GMEA server and Schaap's laptop after the receivership order.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 4

Further investigation and subsequent litigation revealed evidence suggesting the owners of GMEA obtained the loan through multiple fraudulent statements and documents including, in addition to the purchase contracts, forged subordination agreements (also referred to as Standby Creditor's Agreement) and a fraudulent certification verifying certification of the equity injection. The loan application contains inaccurate statements and representations that were most likely fraudulent. It was also learned that there were three pending matters involving litigation against GMEA that would have disqualified it from obtaining an SBA loan or a loan from the Bank. It was also determined that Halman owned 40.25% of GMEA stock and Schaap held only 40.25%. Halman was not qualified to obtain an SBA loan so his ownership was presumably concealed in order to obtain the loan. If his true ownership had been known, the SBA would not have authorized the loan and the Bank would not have given the loan.

All told, the Bank learned that the GMEA loan was obtained through fraudulent means in at least the following ways:

1) the Bank was told Halman was not an owner when he appears to have been an owner of 40.25% of its stock;

2) the Bank was provided altered purchase agreements listing the purchase prices of JCare and A&A at higher amounts than was agreed to with the sellers;

3) there was never an equity injection; and

4) there were multiple lawsuits pending against GMEA that would have disqualified it for an SBA loan.

If any of this information was known the loan would not have been authorized by the SBA or made by the Bank or, if any of this information was known prior to funding of the loan, the funds would not have been authorized to be released by the Bank.

*Bank's Allegations against Starfield*

Having learned of all of the defective documents and false representations after obtaining the receivership order on 01/10/2014, and also learning that the Receiver would not be able to recover on the loan either through liquidation, sale or otherwise, the Bank filed a complaint for legal malpractice against Starfield on 08/25/2014 in Superior Court of Arizona for Maricopa County. The complaint was removed to the United States District Court for Arizona. An amended complaint was filed on 03/04/2015 adding claims for breach of contract, breach of escrow agreement and breach of fiduciary duty.

The Bank claims Starfield knew that it was relying on Starfield to protect the Bank's SBA guaranty; to implement the due diligence and safeguards needed to properly complete the multi-state closings; ensure proper distribution of loan proceeds; and, to create a properly documented

Christopher L. LaVoy, Esq.
November 4, 2016
Page 5

first-lien under the SBA's Authorization and operating procedures.[2] The complaint alleges that Starfield repeatedly disregarded prudent lending standards by failing to investigate suspicious facts and used unreliable and financially conflicted sources of information as evidentiary support for due diligence.[3] The complaint alleges that Starfield looked to Boates and Schaap for information and documents but they were conflicted as they were both members of GMEA's management. Starfield relied on Boates to verify critical facts and did so even though he was an officer of GMEA and was financially conflicted because of his nearly 20% ownership in the company. Also, there was inconsistent information provided about the capital injection that should have led Starfield to question and investigate independently the capital injection and if it had done so it would have been readily confirmed that there was no capital injection and the loan would not have been closed and loan funds released. In addition to the inconsistent information, Starfield relied on receiving the proof of the capital injection, including letters from an attorney and brokerage statements, from Boates. Not only should this information have been obtained independent from Boates but also directly from the Starfield lawyer involved in transferring the funds and verified with her. Instead, the information that was received did not comply with SBA guidelines. As it turned out, all the information was fraudulent and the documents were forgeries. The Bank alleges that Starfield's failure to obtain sufficient proof of the capital injection was negligent and that if the Bank had known that Halman and Schaap had not made the equity injection or that the documents were fraudulent the Bank would have not made the loan.[4]

The complaint also alleges that after $800,000 in loan proceeds were wired by Starfield to JCare seller, Debra Sloan, she sent the money back because she was only owed $650,000 under the purchase contract. Rather than stopping the loan closing and investigate Sloan's reasons for returning the $800,000, Starfield accepted the explanations from GMEA management (Boates and Halman) that the money should be rewired to Sloan which it did. Thereafter, Sloan wired $150,000 of the money to GMEA which diverted the money from the purchase in violation of the SBA Authorization.

The complaint alleges that Starfield failed to independently investigate whether there was litigation against GMEA, the discovery of which would have resulted in the loan not being made. Instead, Starfield relied on a letter from Boates stating there was no pending litigation. In fact, there were three pending lawsuits and some of the funds from the loan that were not used for the purchase prices of JCare and A&A were used to settle one of the suits.

The complaint alleges that Starfield was negligent in relying on GMEA to provide subordination agreements and landlord-release documents that were essential to a competent loan closing that satisfied the SBA's Authorization and operating procedures. Starfield accepted, without independent verification, an opinion letter from Boates representing that all documents needed for the Bank to have a valid first-security-lien interest had been signed. In fact, "many of the documents needed for an enforceable first-lien security interest that met the SBA Authorization's

---

[2] Paragraph 86 of Amended Complaint.

[3] Paragraph 87 of Amended Complaint.

[4] Paragraph 114 of Amended Complaint.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 6

collateral requirements had been forged or fraudulently prepared including the subordination agreements, landlord consents, and standby-agreements . . ." [5]

The complaint alleges that Starfield failed to contact any of the counterparties to the agreements nor did it obtain copies of any of the documents directly from the parties that purported to have signed them and that its decision to rely on Boates (despite his conflicts of interest and suspicious conduct) without contacting any of the counterparties to the agreements, fell below the standard of care.[6]

With regard specifically to the A&A transaction, the complaint alleges that Starfield received a copy of the true purchase agreement reflecting the lower price in an email. Despite receiving this version of the agreement with a different price, Starfield did not make any inquiry of the discrepancy. When the Receiver found the different version of the agreement on the hard drives of the GMEA server and Schaap's laptop, it was discovered that the price agreed to and paid for was different and the amount equaling the difference was not used for the purpose authorized by the SBA authorization. Inasmuch as Starfield knew of the two versions, if it had investigated the issue, the fraud would have been discovered prior to the release of loan funds and the loan would have been cancelled. The Bank's amended complaint states at paragraph 141 that "[a]s a result of Starfield's negligence regarding the fraudulent A&A Purchase Agreement, the Fraudulent A&A Closing Statement, and other irregularities in the Loan, Global Medical [GMEA] successfully induced the Bank to make the Loan in an amount greater than the Bank would have done had it known the true purchase price." Further, the Bank's complaint states that "Starfield's failure to conduct a signature closing attended by the parties; failure to contact the lawyers for the Trakhtmans [the sellers of A&A] regarding their clients' signatures; or to obtain original "blue ink" signed copies of those documents from the Trakhtmans or their attorneys fell below the standard of care . . ." and "[t]he Bank would not have funded any part of the Loan if it had known that Global Medical was using a fraudulent purchase contract and closing statement that overstated the A&A purchase price."

With regard specifically to the JCare transaction, the complaint alleges Starfield failed to directly contact JCare's seller or attorney to verify the authenticity of the purchase agreement and closing statement. Nor did Starfield arrange a closing to witness the parties' signatures on these documents even though Starfield was acting as escrow agent for the transaction and was itself required to sign the final-closing statement.[7] The Bank's complaint alleges that "[if] Starfield had contacted Sloan [the seller of JCare stock] or Rakowski [JCare's attorney] before wiring the closing funds, Starfield would have discovered that [GMEA] was attempting to perpetrate a fraud that Starfield could have prevented by refusing to wire the Loan proceeds."[8] Further, the complaint alleges that Starfield's failure to "conduct a signature closing attended by the parties; failure to contact Sloan or Rakowski regarding the JCare transaction; or to obtain from Sloan or Rakowski the original 'blue ink' signed copies of the documents relating to the purchase, fell below the standard of care for an attorney with special SBA skill and experience." In addition, the Bank's complaint alleges that when Sloan

---

[5] Paragraph 127 of the Amended Complaint.
[6] Paragraph 130 of the Amended Complaint.
[7] Paragraph 150 of Amended Complaint.
[8] Paragraph 153 of Amended Complaint.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 7

returned the wired $800,000 for the purchase of JCare (because the real price was only $650,000)
Starfield was negligent in not investigating or contacting Sloan or Rakowski about the return of
the funds and instead simply contacted Boates and Schaap who convinced Starfield to rewire the
$800,000 to Sloan and have her wire $150,000 to GMEA. If Sloan or Rakowski had been contacted
by Starfield it would have been learned that the actual purchase price was only $650,000 and the
Bank would have instructed Starfield not to make the second $800,000 wire transfer because the
purchase agreement provided to the Bank would have been exposed as a fraudulently prepared
document. Further, the complaint alleges that "if Starfield had competently investigated the
rejected wire, and then consulted with the Bank, the Bank would have investigated other aspects
of the transaction with [GMEA] and would have learned about the fraud relating to the A&A and
JCare purchases and would have been in a positon to potentially reduce its losses."[9]

The complaint states that "the Bank relied on Starfield to perform its services competently and
with the skill and care in SBA closings Starfield claimed to have" but, instead, Starfield
"negligently represented the Bank and through its negligence allowed [GMEA] to trick the Bank
into funding a $3.6 million loan that would never have been made if the truth about the phantom
equity injection and other deceptive facts regarding the A&A and JCare purchase documents had
been known." [10] The complaint states that "[a]s a direct and proximate result of Starfield's
negligence and breach of its contract with the Bank, the Bank suffered substantial damages of not
less than $3,600,000 plus interest, attorneys' fees, and costs."[11]

The lawsuit by the Bank against Starfield remains pending. There have been mediations and
negotiations of a settlement, but there has been no settlement.

In the meantime, an associate general counsel for the SBA indicated to Stephen P. Haggard,
President of the Bank, that he expects the SBA to deny the loan guarantee, requiring the Bank to
reimburse the SBA for its payment of 75% of the loan. It is my understanding that the Bank
believes the SBA will base its denial and demand for reimbursement on the failure to ensure in the
ways required by SBA standard operating procedures that the equity injection was made. However,
to date, it is my understanding that this demand has not been made.

## II.   NOTICE OF CLAIM

On 03/01/2016, ABA Insurance Services Inc. received notice of a claim under the bond. The notice
consists of a letter from Mr. Haggard that states the Bank "has incurred losses stemming from
identified Borrower Fraud." The letter contains a list, which is noted to be not all inclusive, that
the Borrower fraud was perpetrated using the following:

1) Fraudulent Loan Application Submitted to Bank by Borrower;
2) Sham Purchase Contracts Presented to Bank;
3) Sham Certification Letter Presented to Bank Verifying "Bogus" Equity Injection;
   and,

---

[9] Paragraph 164 of Amended Complaint.
[10] Paragraphs 165 and 166 of Amended Complaint.
[11] Paragraph 167 of Amended Complaint.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 8

    4)  Forged Seller Subordination Agreements Presented to Bank by Seller of Business.

Mr. Haggard's letter states that the "Actual Losses (to date)" are $1,759,662 which includes legal fees & receivership fees. The letter states the estimated damages are $4,559,666 which includes legal fees and receivership fees.

## III.  PROOF OF LOSS

On 04/28/2016, ABA Insurance Services Inc. received the proof of loss dated 04/18/2016. The proof of loss makes a claim for a loss in the amount of $2,169,793.09 as a direct result of Securities. The proof of loss references an accompanying letter dated 04/21/2016 from you that provides a factual background of the circumstance of how the loss occurred.

your letter states that the "Bank suffered a loss under Insuring Agreement (E) when it executed credit to GMEA in reliance on the forged and counterfeit documents." Page 3 of letter.

Your letter states as follows:

> GMEA engaged in a complicated and elaborate fraud to induce the Bank to make the Loan, which included *inter alia*:
>
> - Misrepresenting the purchase prices of A&A and JCare so that GMEA's principals could pocket the extra loan money;
> - Misrepresenting that GMEA was paying $480,000 of its own funds towards the purchase of A&A and JCare;
> - Misrepresenting that GMEA was purchasing 100% of A&A's shares when it was only purchasing 90%;
> - Misrepresenting the share-ownership percentages of GMEA's owners; and
> - Forging and counterfeiting numerous Loan-related documents to support these misrepresentations.

The letter states that the fraud was perpetrated by GMEA's three owners – Halman, Schaap and Boates – all of whom are under criminal investigation by the U.S. Attorney's office.

The letter identifies, in addition to Mr. Haggard's 03/01/2016 list of forged and/or counterfeited documents, the following:

    1)  Standby Creditor's Agreement with forged signature of Trakhtman
    2)  Standby Creditor's Agreement with forged signature of Sloan
    3)  A&A stock certificate with forged signature of Craig Boates and that is a counterfeit
    4)  JCare stock certificate with forged signature of Craig Boates
    5)  GMEA stock certificate for Alexander Schaap that is counterfeit
    6)  GMEA stock certificate for Craig Boates that is counterfeit

Christopher L. LaVoy, Esq.
November 4, 2016
Page 9

The letter states that the "Bank discovered the basic outline of the fraud in early 2014, although did not begin to confirm the forging and counterfeiting of key Loan-related documents until mid-2015." Page 3. The letter elaborates as follows:

> Specifically, GMEA defaulted in mid-2013 and the Bank sued it in December 2013 [citation omitted]. The court appointed a receiver for GMEA in early 2014. The receiver proceeded to investigate GMEA's financial affairs, which lead to initial discovery of the fraud. The Bank proceeded to conduct formal discovery in the action, as well as in Halman's ensuing bankruptcy, which revealed the finer details of the fraud [citation omitted]. In particular, the Bank did not confirm that Trakhtman's signatures were forged until it deposed him in April 2015 through Halman's bankruptcy.

The letter states that the loss as of 04/10/2016 is $2,169,793.09 but the 75% guaranteed by the SBA may be denied which would significantly increase the amount of the loss. The $2,169,793.09 is calculated and itemized in the letter as follows:

| | |
|---|---|
| Principal Balance Charge-off | 830,500.43 |
| Accrued Interest | 112,068.91 |
| Late Fees | 25,914.85 |
| Receivership Fees | 200,000.00 |
| Legal Fees | 1,001,308.09 |

## IV.   COVERAGE ANALYSIS

The Bank claims its loss has coverage under Insuring Agreement (E) of the Bond. There is no coverage for the following reasons: 1) Notice of the discovery of the loss was provided after the expiration of the bond; 2) the documents presented by the Bank as being forged, altered or counterfeit are not documents covered under Insuring Agreement (E); and, 3) the forged, altered or counterfeit documents did not cause the loss.

### A. There is No Coverage Because Notice of the Loss was Provided after the Bond Expired

#### 1. Discovery and Applicable Bond

Coverage is analyzed under Bond number 8100008898-131 that has a Bond Period identified in Item 2 of the Declarations Page of 05/22/2013 to 05/22/2014. This Period is changed in an Amendment to the Declarations Page to 05/22/2013 to 10/24/2014. This bond is implicated because the "Bank discovered the basic outline of the fraud in early 2014" when the Receiver investigated GMEA's financial affairs which led to the initial discovery of the fraud. The Bank's complaint filed on 08/25/2014 against Starfield identifies the fraud. The complaint identifies the owners of GMEA as having perpetrated a fraud and how. It also identifies many of the documents that the Bank presents as covered documents under Insuring Agreement (E).

The Bond states under Conditions and Limitations at Section 3 in pertinent part follows:

Christopher L. LaVoy, Esq.
November 4, 2016
Page 10

This bond applies to loss first discovered by the Insured during the Bond Period. Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of the loss may not then be known.

The Bank was aware of facts which would cause a reasonable person to assume that a loss of the type covered by the bond, specifically Insuring Agreement (E), had been incurred by "early 2014" when it discovered that fraud was associated with the transaction. Accordingly, discovery could not have been at any time after early 2014. I have discovered no evidence that discovery occurred prior to the appointment of the receiver on 01/10/2014. Indeed, prior to 07/05/2013, when GMEA first failed to make a payment, there was no indication that there was any problem with the loan. Accordingly, the loss was discovered in the bond period of 05/22/2013 to 10/24/2014 that applies to bond number 8100008898-131.

### 2.  Late Notice and Late Proof of Loss Preclude Coverage

At Section 5(a) through (b) of Conditions and Limitations, the bond states in pertinent part as follows:

(a)  At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof.

(b)  Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars.

The Bank provided notice on 03/01/2016 which was over two years after the loss was discovered. Not only was notice late, it was received well after the bond had expired on 10/24/2014. The Bank's violation of Section 5(a) and 5(b) of the bond bar the Bank's claim.

In *Alianza Hispano-Americana v. Hartford Acci. & Indem. Co.*, 1954 U.S. App. LEXIS 3651, 209 F.2d 578 (9th Cir. Ariz. 1954), the Court upheld a finding that conditions of notice and furnishing of proof of loss in the bond are required for coverage. The court affirmed a judgment for the insurer on findings that the insured had failed to comply with conditions precedent prescribed by the bond in respect of the giving of notice and the furnishing of proofs of loss.

While prejudice is not required to demonstrate there is no coverage under the bond, Everest reserves all rights with regard to proving prejudice for the late notice. For instance, and in no way limiting in any way its reservation of rights, notice, outside the bond period is *a fortiori* prejudice to the underwriter. Further, in the two years since the loss was discovered, extensive litigation has taken place including discovery in the legal malpractice case and the Halman bankruptcy case with respect to which, Everest had no ability to be informed of or participate in.

The Bank's violation of Sections 5(a) and 5(b) of the bond bar the Bank's claim.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 11

### 3. Bond issued 10/24/2014

The Bank requested the claim be considered under bond number 8100008898-141 that has a bond period of 10/24/2014 to 10/24/2017. Section 3 of the Conditions and Limitations portion of this bond provides that the bond "applies to loss first discovered by the Insured during the Bond Period." Because the loss was discovered in early 2014, it is not covered by bond number 8100008898-141 because it was not discovered in the bond period.

### B. The Bond Does Not Provide Coverage for the Documents Identified by the Bank as Altered, Forged, Counterfeit or Otherwise Fraudulent

The Bank's loss arises out of its loan to GMEA. In general, loan losses such as the one experienced by the Bank are excluded from Bond coverage. Exclusion (e) of the Bond provides that the Bond does not cover:

> (e)   loss resulting directly or indirectly from the complete or partial nonpayment of, or default upon, any Loan or transaction involving the Insured as a lender or borrower, or extension of credit, including but not limited to the purchase, discounting or other acquisition of false or genuine accounts, invoices, notes, agreements or Evidences of Debt, whether such Loan, transaction or extension was procured in good faith or through trick, artifice, fraud or false pretenses, except when covered under Insuring Agreements (A), (E) or (G).

There are three exceptions to the Loan Loss Exclusion, i.e., when coverage is available under Insuring Agreements (A), (E) or (G). The facts of this claim do not implicate the provisions of either Insuring Agreement (A), Fidelity, or (G), Fraudulent Mortgages. Coverage for this matter has been submitted and analyzed under the terms of Insuring Agreement (E), Securities.

### 1. Coverage under Insuring Agreement (E)

Insuring Agreement (E) provides coverage as follows:

> The Underwriter, in consideration of an agreed premium, and in reliance upon all statements made and information furnished to the Underwriter by the Insured in applying for this bond, and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the Insured for:
>
> *   *   *
>
> SECURITIES
>
> (E)   Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others,
>
>> (1)   acquired, sold or delivered or given value, extended credit or assumed liability, on the faith of, any Written, Original
>>
>>> (a)     Certificated Security,

Christopher L. LaVoy, Esq.
November 4, 2016
Page 12

     (b)    Document of Title,

     (c)    deed, mortgage or other instrument conveying title to, or creating or discharging a lien upon, real property,

     (d)    Certificate of Origin or Title,

     (e)    Certificate of Deposit

     (f)    Evidence of Debt,

     (g)    corporate, partnership or personal Guarantee, or

     (h)    Security Agreement,

which (i) bears a handwritten signature which is material to the validity or enforceability of the security, which is a Forgery, or (ii) is altered, but only to the extent the Forgery or alteration causes the loss or (iii) is lost or stolen;

     (2)    guaranteed in writing or witnessed any signature upon any transfer, assignment, bill of sale, power of attorney, guarantee, endorsement or any items listed in (a) through (h) above; or

     (3)    acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (a) through (e) above which is a Counterfeit, but only to the extent the Counterfeit causes the loss.

Actual physical possession of the items listed in (a) through (h) above by the Insured, its correspondent bank or other authorized representative, is a condition precedent to the Insured's having relied on the faith of such items.

A reproduction of a handwritten signature is treated the same as the handwritten signature. An electronic or digital signature is not treated as a reproduction of a handwritten signature.

In order for coverage to be available under the terms of Insuring Agreement (E), the following requirements must be met:

    (1) The Bank must have extended credit on the faith of one of the specific types of documents enumerated in Insuring Agreement (E);

    (2) that document must have been a Written, Original;

    (3) the document must contain one of the specified defects set forth in Insuring Agreement (E), i.e., forged, altered, lost, stolen, or in certain circumstances, Counterfeit; and

    (4) the Bank must have had actual physical possession or the Written, Original document prior to extending credit on the faith of the document.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 13

### 2. Documents Presented by Bank for Coverage Under Insuring Agreement (E)

The Bank identified in Mr. Haggard's 03/01/2016 letter the following list of forged and/or counterfeited documents:

1) Fraudulent Loan Application Submitted to Bank by Borrower,
2) Sham Purchase Contracts Presented to Bank,
3) Sham Certification Letter Presented to Bank Verifying "Bogus" Equity Injection,
4) Forged Seller Subordination Agreements Presented to Bank by Seller of Business

The proof of loss identified the following as forged and/or counterfeit documents:

1) Standby Creditor's Agreement with forged signature of Trakhtman
2) Standby Creditor's Agreement with forged signature of Sloan
3) A&A stock certificate with forged signature of Craig Boates and that is a counterfeit
4) JCare stock certificate with forged signature of Craig Boates
5) GMEA stock certificate for Alexander Schaap that is counterfeit
6) GMEA stock certificate for Craig Boates that is counterfeit

The documents above are analyzed for coverage as follows in the order presented above. Each element required under Insuring Agreement (E), Covered Document, Written Original, Specified Defect and Actual Physical Possession is considered for each of the documents the Bank presents for coverage.

### a. Fraudulent Loan Application Submitted to Bank by Borrower

The loan application signed by the GMEA owners presumably contains false information. Insuring Agreement (E) of the Bond does not guarantee the truth of documents. If documents are not truthful and a loss results therefrom, the loss is not covered. *See, Liberty National Bank v. Aetna Life & Casualty Company*, 568 F. Supp. 860 (D. N.J. 1983). The Bank has not and cannot satisfy all the requirements of Insuring Agreement (E) with respect to the loan application.

#### *Covered Document*

The first requirement of Insuring Agreement (E) the Bank must establish is that it extended credit in good faith and in reliance on a specific type of document covered by Insuring Agreement (E). A loan application is not a covered document under the terms of Insuring Agreement (E) listed in sections (a) through (h). Accordingly, this element is not satisfied.

#### *Written Original*

The second requirement of Insuring Agreement (E) the Bank must establish is that it extended credit in good faith in reliance on a covered document which was a Written, Original. Written is defined in Section 1(v) of the Bond as follows:

Written means expressed through letters or marks placed upon paper and visible to the eye.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 14

Original is defined in Section 1(q) as follows:

> Original means the first rendering or archetype and does not include photocopies or
> electronic transmissions even if received and printed.

The loan application is a Written document and the Bank received the Original. This element is
met but the application is not a covered document.

### Specified Defect

The third requirement of Insuring Agreement (E) the Bank must establish is that it extended credit
in good faith in reliance on a Written Original covered document which is forged, altered, lost,
stolen, or in certain circumstances, Counterfeit. There is no allegation that the application the Bank
received is defective in one of the ways required by Insuring Agreement (E), i.e., it is not forged,
altered, lost, stolen or Counterfeit. This element is not met.

### Actual Physical Possession

The last requirement of Insuring Agreement (E) the Bank must establish is that it had actual
physical possession of the Written Original of the loan application. The Bank did receive and had
actual physical possession of the Written Original before it extended credit but because it is not a
covered document and contains no specified defect, there is no coverage under Insuring Agreement
(E).

The Bank's claim regarding the fraudulent loan application is based on the fact that the information
contained in the document is not truthful – a claim that is not covered by Insuring Agreement (E)
and otherwise excluded from coverage by virtue of Exclusion (e).

### b.  Sham Purchase Contracts Presented to Bank

The Stock Purchase Agreements are two documents that GMEA provided to the Bank indicating
agreement to purchase stock of JCare and A&A by GMEA. The JCare document contains an
agreement for the purchase of all outstanding JCare stock by GMEA and the A&A contract does
likewise for its stock. The documents are presumed to be altered, forged or counterfeit. Deposition
testimony by the signatories of the agreements indicated that the purchase amounts were altered.

### Covered Document

The Bank presents the Stock Purchase Agreements as Security Agreements under Insuring
Agreement (E)(1)(h). Security Agreement is defined in the bond in Section 1 of Conditions and
Limitations at subsection (s) as follows:

> Security Agreement means a Written agreement which creates an interest in
> personal property or fixtures and which secures payment or performance of an
> obligation.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 15

The Stock Purchase Agreements are between GMEA as buyer and each seller. With regard to A&A, the seller is Mikhail Trakhtman and with regard to JCare, the seller is Debra Sloan. Both are agreements between the parties to sell stock. The Factual Background letter attached to the proof of loss states that the Agreements qualify as a Security Agreement because "each Stock Purchase Agreement, as reflected in Section 5.2 thereof and the exhibits thereto, grants the seller a security interest in GMEA's assets, including the purchased stock, to secure GMEA's repayment of the promissory notes given the sellers."

Section 5.2, (Section 5 is titled "Buyer's Closing Documents") of each agreement states as follows:

> At the Closing, the Buyer shall execute and deliver to the Sellers the following documents:
>
> *   *   *
>
> 5.2 *Security Documents*. The Buyer Security Agreement, duly executed by the Buyer, together with stock powers endorsed in blank for each pledge of stock or equity in accordance therewith as well as the original stock certificates or instruments representing stock or securities subject to such pledge; the Corporation Security Agreement, duly executed by the Corporation; and the Guarantor Security Agreements, duly executed by each of the Subsidiaries.

Under Section 2 of each Stock Purchase Agreement, titled "Purchase Price," at subsection 3, the agreements state as follows:

> 2.3 As security for the full and prompt satisfaction of Buyer's obligations under the Notes, (i) Buyer shall grant to Sellers a security interest in and shall pledge all the Stock, as well as all of the stock, securities and other equity interests held by the Buyer in each of the Subsidiaries, pursuant to a security and pledge agreement, in the form attached hereto as Exhibit C (the "Buyer Security Agreement"), (ii) Buyer shall cause the Corporation, as a guarantor of Buyer's obligations under the Notes, to grant to Sellers a security interest in all of the assets of the Corporation, pursuant to a guaranty and security agreement, in the form attached hereto as Exhibit D (the "Corporation Security Agreement") and (iii) Buyer shall cause each of the Subsidiaries, as a guarantor of Buyer's obligations under the Notes, to grant to Sellers a security interest in all of its assets, pursuant to a guaranty and security agreement, in substantially the form attached hereto as Exhibit E (each a "Guaranty Security Agreement").

The bond specifically provides that a defective document cannot be combined with another document not defective in order to trigger coverage. This is set forth in the Anti-Bundling provision contained in Section 9 of the Conditions and Limitations of the bond that states as follows:

> If any Insuring Agreement requires that an enumerated type of document be altered or Counterfeit, or contain a signature which is a Forgery or obtained through trick, artifice, fraud or false pretenses, the alteration or Counterfeit or signature must be on or of the enumerated document itself not on or of some other document

Christopher L. LaVoy, Esq.
November 4, 2016
Page 16

submitted with, accompanying or incorporated by reference into the enumerated document.

The Stock Purchase Agreements provide security for payment by virtue of the documents attached and incorporated into the agreements pursuant to Section 2.3 and 5.2 (Buyer Security Agreement, Corporation Security Agreement and Guaranty Security Agreement) and not standing alone. The documents incorporated into the Stock Purchase Agreements are not alleged to be forged or otherwise defective. Because of this, the Stock Purchase Agreements are not Security Agreements because they do not, standing alone, secure payment of an obligation. Furthermore, the Bank does not have proof in the form of testimony or sworn affidavit that the agreements were forged or altered. The deposition testimony of Trakhtman and Sloan was not specific in this regard although they did certainly testify that the purchase agreements they signed were not the ones the Bank received from GMEA because the purchase prices were different. Based upon the testimony, the Bank has not presented evidence of whether there was an alteration or forgery.

### Written Original

The second requirement of Insuring Agreement (E) the Bank must establish is that it extended credit in good faith in reliance on a covered document which was a Written Original. The Stock Purchase Agreements are written on paper. The Bank has the "blue ink" original of the JCare agreement but not for the A&A agreement. The Bank did not have the original of the A&A agreement. Accordingly, this requirement is not met. Also, the Bank has not demonstrated that it had the original of the JCare agreement at the time it extended credit. Although the "blue ink" copy is contained in the Bank loan file, it appears that the Bank did not have the "blue ink" copy at the loan closing. As alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. It is not known when the original JCare agreement was received by the Bank. It appears that it was received after the funds were released on the loan. Accordingly, the Bank has not proven the requirement that it extended the credit in reliance on a covered document which was a Written Original.

### Specified Defect

The third requirement of Insuring Agreement (E) the Bank must establish is that it extended credit in good faith in reliance on a Written Original covered document which is forged, altered, lost, stolen, or in certain circumstances, Counterfeit. The Bank maintains that the agreements contain the forged signatures of the Sellers, Mikhail Trakhtman and Debra Sloan. Both testified that they did not sign the Agreements containing the higher purchase prices. They did not testify that their signatures were forged. It is unclear if the JCare document was altered with the forged signature or that the signature was forged with the altered purchase price and then submitted to the Bank. Because the Bank has not proved the forgery, this requirement has not been established.

### Actual Physical Possession

The last requirement of Insuring Agreement (E) that the Bank must establish is that it had actual physical possession of the Written Original of the Stock Purchase Agreements. The Bank has the "blue ink" original of the JCare agreement but not for the A&A agreement. The Bank has not

Christopher L. LaVoy, Esq.
November 4, 2016
Page 17

demonstrated that it had actual physical possession of both at the time it extended credit. Although the "blue ink" copy of the JCare agreement is contained in the Bank loan file it is unknown if the original was obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had actual physical possession prior to extending credit.

<strong>c.   Sham Certification Letter Presented to Bank Verifying "Bogus" Equity Injection</strong>

The Bank has determined that the letter from an attorney verifying that the equity injection had been made was fraudulent. It appears that it may have been created by GMEA and sent to Starfield from GMEA. It was not from the attorney identified in the letter and as it was later learned no equity injection was made.

<em>Covered Document</em>

Mr. Haggard identified the sham certification letter in his initial letter of a potential claim. His letter does not identify any insuring agreement that might be implicated and the Bank's proof of loss and accompanying documentation does not identify a provision of Insuring Agreement (E) where coverage might be triggered. The letter is not among the documents listed in Insuring Agreement (E)(1)(a) through (h) and is accordingly not a covered document.

<em>Written Original</em>

The letter contained in the loan file is a copy of the letter that appears to have been transmitted electronically to the Bank. Accordingly, the Bank did not rely on the Written Original to extend the credit.

<em>Specified Defect</em>

What is known about the creation of the document is that it was completely made up by someone at GMEA by cutting and pasting portions of a letter, including letterhead, from the real law firm called Saul Ewing LLP, located in Baltimore. The letter contains a signature of Katherine Hickey, an attorney at that firm. During the receivership, the law firm was contacted and indicated that it did not prepare the letter. Attorney Hickey did not state or provide any evidence that her signature was forged but the firm indicated that the letter did not come from it. Under these circumstances, there is no proof that the letter contains any of the defects required by Insuring Agreement (E), i.e., forged, altered, lost, stolen, or Counterfeit.

<em>Actual Physical Possession</em>

The Bank never received actual physical possession of the Written Original of the letter. Accordingly, this requirement for coverage under Insuring Agreement (E) is not present.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 18

### d.   Standby Creditor's Agreements

The documents referenced in Mr. Haggard's letter as forged seller subordination agreements are the same documents identified in the proof of loss factual background letter as **Standby Creditor's Agreement with forged signature of Trakhtman** and **Standby Creditor's Agreement with forged signature of Sloan**. This analysis refers to the two documents as Standby Creditor's Agreements.

After payment with loan proceeds to purchase A&A and JCare, GMEA still owed the A&A seller, Mikhail Trakhtman, $500,000.00 and the seller of JCare, Debra Sloan, $325,000.00. The Standby Creditor's Agreements were to ensure that Trakhtman and Sloan agreed to not accept payment from GMEA for this debt until June, 2016 and to be otherwise subordinate to the Bank's loan and turn over any payment it may receive before June, 2016 to the Bank. The agreement that contains Trakhtman's signature states in pertinent part as follows:

> Global Medical Equipment of America, Inc. (Standby Borrower) owes $500,000.00 principal and interest to Michael Trahktman [sic] (Standby Creditor) as of the date of this Agreement (Standby Loan) (Copy of Standby Note attached). To induce Metro Phoenix Bank (Lender) to make an SBA guaranteed loan to Standby Borrower, Loan Number 52693950-09 in the amount of $3,631,000.00 (Lender's Loan), Standby Creditor agrees:

> 1. To accept payments of principal and interest at the rate of 5.00% per annum beginning on June 29, 2016
> 2. To turn over to Lender payments received by Standby Creditor from Standby Borrower in violation of this Agreement within 15 days of receipt.
> 3. That the Standby Debt is and shall be subordinate to the Lender's Loan, and all other present and future indebtedness, obligations, liabilities, claims, rights and demands of any kind which may be now or hereafter guaranteed by or owing from borrower to Lender.

> To take no action to enforce claims against Standby Borrower on the Standby Loan until Lender's Loan is satisfied and paid in full.

The agreement that has Ms. Sloan's signature contains the same language but the loan amount is $325,000.00. Attached to each agreement is a "Standby Note" that is a promissory note from GMEA for the specific amount signed by Halman as President and CEO of GMEA.

#### *Covered Document*

The Bank asserts in the proof of loss factual background letter that the Standby Creditor Agreements qualify as Security Agreements under Insuring Agreement (E). The letter states the agreements create "an interest in the Bank's favor in the standby creditor's [Trahktman's and Sloan's] right to payment." The bond defines a Security Agreement as a "Written agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." However, the agreements, standing alone, do not secure payment to the Bank on

Christopher L. LaVoy, Esq.
November 4, 2016
Page 19

the loan it gave to GMEA or to payment to Trahktman and Sloan. The agreements provide that Trahktman and Sloan will forego payment for the benefit of the Bank but do not in any way secure payment from GMEA on the SBA loan provided by the Bank or to Trahktman and Sloan on their promissory notes. For this reason, they are not Security Agreements as defined in the bond. Furthermore, the bond specifically provides that a forged document cannot be combined with another document not forged in order to trigger coverage as provided in the Anti-Bundling provision referred to above. The Standby Creditor's Agreements incorporate the promissory notes from GMEA to the Sellers, Trahktman and Sloan, which is subordinated to any payment GMEA has owing to the Bank. This is the interest the Bank claims creates an interest in its favor. Specifically, the factual background letter states' "the Standby Creditor's Agreement creates an interest in the Bank's favor in the standby creditor's right to payment" and "the standby creditor agrees to "turn over" to the Bank any payment that it receives from GMEA in violation for the Standby Creditor's Agreement." The promissory notes attached the agreements are not forged. The Standby Creditor's Agreements create no security interest without the promissory notes incorporated thereto. Thus, standing alone, the Standby Creditor's Agreements create no security agreement.

Because the Standby Creditor's Agreements, standing alone, do not secure payment of the loan to GMEA, they are not covered documents under Insuring Agreement (E).

### *Written Original*

The Standby Creditor's Agreements are Written as they were received on paper. Although the "blue ink" originals are contained in the Bank loan file it is unknown if the original was obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had actual physical possession prior to extending credit.

### *Specified Defect*

The agreements contain forged signatures. Trahktman and Sloan testified in deposition testimony in the Starfield litigation that they never agreed to the agreements, were unaware of them and that the signatures on the agreement were not theirs. Accordingly, the Bank can satisfy that the documents were forged.

### *Actual Physical Possession*

Although the "blue ink" originals are contained in the Bank loan file it is unknown if the original was obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had actual physical possession prior to extending credit.

### e.  Stock Certificates

To secure the loan, GMEA provided the Bank with stock certificates for the purchased A&A and JCare stock. The A&A certificate states that GMEA is the owner of 100 shares of A&A stock. It

Christopher L. LaVoy, Esq.
November 4, 2016
Page 20

is dated June 25, 2012 and is signed by Halman and Boates. The JCare certificate states that GMEA is the owner of 1000 shares of JCare and is dated June 25, 2012 and signed by Halman and Boates. The Bank claims that the Boates signature on each stock certificate appears to be forged based on a comparison to notarized exemplars of his signature. The A&A stock certificate also appears to be counterfeit because it lists GMEA as owning 100 shares of A&A stock even though it only purchased 90.

The Bank also presents two additional stock certificates for coverage under Insuring Agreement (E). GMEA provided copies of Schaap's and Boate's GMEA stock certificates. Schaap's stock certificate states that he is the owner of 8,050,000 shares of stock of GMEA. It is dated May 1, 2010 and is signed by Halman and Boates. The Boates certificate states that he is the owner of 1,905,000 shares of GMEA stock. It is dated May 1, 2010 and is signed by Halman and Schaap. The Bank maintains that the stock certificates are counterfeit because they misstate the number of shares that Schaap and Boates own.

### Covered Document

The Bank argues that all of the stock certificates qualify as a Certificated Security under Insuring Agreement (E). Certificated Security is defined in Section 1 of Conditions and Limitations of the Bond, Definitions, at subsection (c) as follows:

> Certificated Security means a share, participation or other interest in property of or an enterprise of the issuer or an obligation of the issuer, which is:
>
> (1)     represented by a Written instrument issued in bearer or registered form;
>
> (2)     of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
>
> (3)     either one of a class or series or by its terms divisible into a class or series of shares, participations, interests or obligations.

The stock certificates are Written instruments in bearer form that evidence ownership in the stock identified. Each stock certificate appears to meet the definition of a Certificated Security as defined by the bond.

### Written Original

Both Written Originals of the **A&A stock certificate** and the **JCare stock certificate** are contained in the loan file that I examined. However, it is unknown if the original was obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had the Written Originals prior to extending credit.

With regard to the **GMEA stock certificate for Alexander Schaap** and the **GMEA stock certificate for Craig Boates**, the Bank did not have the Written Original at the time the credit was extended. Further, the Written Originals were not contained in the Bank's loan file that I examined.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 21

*Specified Defect*

The Bank claims that the Boates signature on the **A&A stock certificate** and on the **JCare stock certificate** "appears to be forged based on a comparison to notarized exemplars of his signature." The bond defines Forgery in Conditions and Limitations, Definitions, at Section 1(j) as follows:

(j)     Forgery means:

(1)     affixing the handwritten signature, or a reproduction of the handwritten signature, of another natural person without authorization and with intent to deceive; or

(2)     affixing the name of an organization as an endorsement to a check without authority and with the intent to deceive.

Provided, however, that a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose is not a Forgery. An electronic or digital signature is not a reproduction of a handwritten signature or the name of an organization.

Boates has not testified or provided an affidavit that his signature is forged. It is not known if he signed the documents and it is certainly not known if his name was signed without his authorization. Given that he was part of a scheme between the two other owners of GMEA to defraud the Bank it is more likely than not that he did authorize the signature even if he did not sign it. It is established that he provided other information that was false and designed to perpetrate the fraud against the Bank such as his letter indicating that there was no pending litigation against GMEA. Boates was part of and integral to the whole fraudulent scheme against the Bank. He also benefited from the fraud. There is no direct proof that his signatures on the stock certificates are forged. Further, if the signatures were signed by Halman, or someone else, it is clear that Boates, given his position in the scheme, authorized the signatures and he benefited by them. It is certainly clear that he ratified the signing as he undoubtedly knew that they were submitted to the Bank because he knew GMEA was claiming Halman was not an owner of GMEA when he was an owner.

The Bank claims the GMEA Stock Certificates for Alexander Schaap and the **GMEA stock certificate for Craig Boates** are counterfeits. The bond defines Counterfeit in Conditions and Limitations, Definitions, at Section 1(e) as follows:

(e)     Counterfeit means a Written imitation of an actual, valid Original which is intended to deceive and to be taken as the Original.

The GMEA Stock Certificates are not counterfeits. They are not imitations of actual, valid Originals. Instead, they were completely made up and fictitious as they did not indicate the real amount owned by Schaap and Boates. A counterfeit would be an imitation of a valid Original of the stock certificates reflecting the true ownership of Schaap and Boates in GMEA.

A specified defect has not been proven with regard to any of the stock certificates.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 22

### *Actual Physical Possession*

Although the "blue ink" originals of the A&A and JCare stock certificates are contained in the Bank loan file it is unknown if the originals were obtained prior to providing credit because, as alleged in the Bank's complaint against Starfield, the documents were not signed in the presence of a Starfield attorney. Accordingly, the Bank has not proven the requirement that it had actual physical possession prior to extending credit.

In addition to the above, the stock certificates are for stock in GMEA, JCare and A&A. Each entity is now insolvent or nonexistent. Insuring Agreement (E) provides that loss due to a forgery or alteration is covered "only to the extent the forgery or alteration causes the loss." The Bank would have experienced loss regardless of any forgery or alteration because the stock in GMEA, JCare and A&A was worthless as determined by the Receiver of GMEA. If the stock in the companies had value but the bank could not recover on them because of the forgery or alteration, coverage may have been triggered. However, because the stock in the companies has no value the forgeries and alterations did not cause the Bank's loan loss. Likewise, with any counterfeit, Insuring Agreement (E) requires the counterfeit cause the loss. The stock certificates are not counterfeits because they are not written imitations of actual, valid Originals. Rather, they are made up documents, not imitations of actual stock certificates that contained a correct amount of stock owned.

### C. **Other Applicable Bond Provisions**

While there is no coverage for this claim, given the information presented by the Bank in its proof of loss, the following exclusions and bond provisions bear mentioning because they impact on the amount of loss the Bank alleges:

Exclusion (s) is contained in Section 2 of Conditions and Limitations and states that the bond does not cover the following:

> Potential income, including but not limited to interest and dividends, not realized
> by the Insured.

The amount of loss presented by the Bank in the proof of loss contains potential income, including interest and fees, that is excluded from coverage.

Exclusion (u) is contained in Section 2 of Conditions and Limitations and states that the bond does not cover the following:

> all fees, costs and expenses incurred by the Insured
>
> (1)   in establishing the existence of or amount of loss covered under this bond, or
>
> (2)   as a party to any legal proceeding whether or not such legal proceeding
> exposes the Insured to loss covered by this bond;

The proof of loss contains loss related to receivership fees and legal fees. These expenses are not covered by the bond.

Christopher L. LaVoy, Esq.
November 4, 2016
Page 23

Exclusion (v) is contained in Section 2 of Conditions and Limitations and states that the bond does not cover the following:

> indirect or consequential loss of any nature including, but not limited to, fines, penalties, multiple or punitive damages;

Any claim for this type of loss is excluded.

Finally, Section 6 of the bond states as follows:

> The value of any loss for purposes of coverage under this bond shall be the net loss to the Insured after crediting any receipts, payments or recoveries, however denominated, received by the Insured in connection with the transaction giving rise to the loss. If the loss involves a Loan, any interest or fees received by the Insured in connection with the Loan shall be such a credit.

The Bank received payments and recoveries and accordingly all these amounts would reduce any loss that would be covered under the bond pursuant to Section 6.

## V. CONCLUSION

There is no coverage for the following reasons: 1) Notice of the discovery of the loss was provided after the expiration of the bond; 2) the documents presented by the Bank as being forged, altered or counterfeit do not meet the required elements for coverage under Insuring Agreement (E); and, 3) the forged, altered or counterfeit documents did not cause the loss.

The coverage position set forth above is based upon all presently available information. In the event that you believe that this position is incorrect, or that we have overlooked a relevant fact, we will reevaluate this matter on the basis of any additional documentation, factual information or applicable precedent which you submit. If you disagree with Everest's position or have a question or concern, please feel free to contact me.

No statement herein should be considered a waiver of any right, defense or privilege that Everest may have under the Bond or law, regardless of whether the provision has been noted herein.

Sincerely,

John Cullen
Senior Attorney

JLC:st

# Exhibit 4

‖‖‖ ABA
‖‖‖ Insurance
‖‖‖ Services

ABA Insurance Services Inc.                    www.abais.com
5910 Landerbrook Drive, Suite 100    800 274 5222 T
Mayfield Heights, Ohio 44124            800 456 6590 F

March 1, 2017

Christopher L. LaVoy, Esq.
Tiffany & Bosco, P.A.
Seventh Floor Camelback Esplanade II
2525 E·Camelback Road
Phoenix, AZ 85016

*__VIA EMAIL cal@tblaw.com AND REGULAR U.S. MAIL__*

Re:    Insured:                              Metro Phoenix Bank
       Financial Institution Bond No.:       8100008898-131
       Claim No.:                            ABA0002377
       Matter:                               Global Medical Equipment of America

Dear Chris:

Thank you for your letter dated December 1, 2016 requesting Everest reconsider its position on
this claim and thereafter providing supplemental argument and materials.

You indicate in your letter that the Bank had the "blue ink" originals of the two forged Standby
Creditor's Agreements prior to providing the credit to Global Medical Equipment of America
(GMEA). You provided emails from Alexander Schapp stating that he would be delivering the
originals to the Bank on June 28, 2012 which was prior to the funding of the GMEA loan. In the
November 4, 2016 letter setting forth Everest's position on coverage it is stated that it was
unknown if the Bank had the originals at the time of funding. We appreciate you providing the
emails that may indicate the originals were provided before the funding and, as the coverage letter
stated, the originals are contained in the Bank's loan file that I reviewed.

However, even if the Bank had the originals prior to funding the GMEA loan, the Standby
Creditor's Agreements are not Security Agreements as that term is defined in the Bond for the
reasons explained in the November 4, 2016 coverage letter. The Standby Creditor's Agreements
do not secure payment of the Bank loan to GMEA.

Your letter states that the Standby Creditor's Agreements would qualify, in addition, or
alternatively, as Guarantees under the Bond. Your letter states they obligate Trahktman and Sloan
to pay money to the Bank that would be credited to the Bank under Paragraph 2 of the Agreements.
Paragraph 2 obligates Trahktman and Sloan "[t]o turn over to Lender [the Bank] payments received
by [them] from [GMEA] in violation of [the] Agreement . . ."

The Bond defines Guarantee in Section 1(k) of Conditions and Limitations in pertinent part as
follows:

Christopher L. LaVoy, Esq.
March 1, 2017
Page 2

        Guarantee means a Written undertaking obligating the signer to pay the debt of
        another, to the Insured . . . if the debt is not paid in accordance with its terms.

The Agreements do not obligate Trahktman and Sloan to pay GMEA's loan. It only obligates them
to turn over any money they may receive from GMEA before the Bank's loan is paid. The Standby
Creditor's Agreements do not obligate Trahktman and Sloan to pay the GMEA loan if GMEA
defaults on the loan but only to accept payments after payment has been made to the Bank. The
Bank has no rights to payment from Trahktman and Sloan under the Agreements in the event of
GMEA's default. Your letter states that the Bond's definition of Guarantee does not require it to
cover all borrower breaches and the entire loan debt. However, the Agreements do not require
Trahktman and Sloan to pay any GMEA debt, only to turn over any payments it receives from
GMEA to the Bank before GMEA's loan is paid. If the signatures of Trahktman and Sloan were
genuine, the Agreements would not obligate them to pay the GMEA debt owed to the Bank and it
is my understanding that there were no payments to Trahktman and Sloan that would have been
collectible under the terms of the Agreements. For all these reasons, the Standby Creditor's
Agreements are not Guarantees and are not covered documents under the Bond.

Whether the Bank had the "blue ink" originals of the Standby Creditor's Agreements prior to
funding the loan does not change the coverage determination under the Bond because the Standby
Creditor's Agreements are not Security Agreements or Guarantees under the Bond and therefore
are not covered documents under Insuring Agreement E.

With regard to the late notice, your letter states that Arizona courts have adopted the "notice
prejudice" rule. You cite the *Zuckerman* case that involved an occurrence fire policy. It is not clear
that this case would apply to the Bond that provides coverage for claims made during the Bond
Period and requires notice within 30 days. *The Maryland Casualty Co.* case that you cite involved
a fidelity policy but notice was timely provided during the policy period. The ruling in the case
was limited to the time required to provide a proof of loss to a carrier after timely notice. Metro
Phoenix provided notice over two years after the Bank discovered the loss and after the Bond
Period had expired. An Arizona court would likely find that prejudice is not required under these
circumstances and accept the reasoning in *Sletten v. St. Paul Fire & Marine Ins. Co.,* 161 Ariz.
595, 780 P.2d 428 (Ct. App. 1989) and *Thoracic Cardiovascular Assocs., Ltd. v. St. Paul Fire &
Marine Ins.* 181 Ariz. 449, 891 P.2d 916 (Ct. App. 1994) where the courts distinguished claims
made policies to occurrence policies and found no prejudice is required when notice of a claim is
provided after expiration of the policy period. Regardless of this, there is prejudice to Everest as
outlined in the November 4, 2016 coverage letter. Notice was provided outside the Bond Period,
two years after the loss was discovered. In the two years after the loss was discovered extensive
litigation took place including discovery in the legal malpractice case and the Halman bankruptcy
during which Everest had no ability to be informed or participate.

Everest finds no coverage for this claim under the bond for the foregoing reasons and for those set
forth in the November 4, 2016 coverage letter. You have inquired about whether Everest is
interested in negotiating a settlement or compromise with the Bank because it disagrees with
Everest's position. Should the Bank wish to make a settlement demand we will certainly present

Christopher L. LaVoy, Esq.
March 1, 2017
Page 3

it to Everest for its consideration.

No statement herein should be considered a waiver of any right, defense or privilege that Everest may have under the Bond or law, regardless of whether the provision has been noted herein.

Sincerely,

John Cullen
Senior Attorney

JLC:st

BEST MESSENGER SERVICE
P.O. BOX 1029
PHOENIX, AZ 85001-1029
602-246-7702

MICHAEL K. JEANES, CLERK
RECEIVED CCB
DOCUMENT DEPOSITORY

'17 OCT 16  PH 3: 48

FILED BY A. S. ROMERO

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR MARICOPA COUNTY

| | |
|---|---|
| MPB COLLECTION, LLC<br>    Plaintiffs<br><br>Vs<br><br>EVEREST NATIONAL INSURANCE COMPANY<br>    Defendants | NO. CV2017-013705<br><br>CERTIFICATE OF SERVICE |

I, Brett Long, hereby swear that I am duly qualified to serve process in this cause, having been so appointed by the Maricopa County Superior Court, and that I received the following document(s) in this action:

**SUMMONS, COMPLAINT, CERTIFICATE OF COMPULSORY ARBITRATION**

from CHRISTOPHER A. LAVOY (SBN 016609) OF TIFFANY & BOSCO, P.A. on 10/10/2017 and that I personally served the same upon the party/parties in the manner named below:

**NAME: EVEREST NATIONAL INSURANCE COMPANY C/O ARIZONA DEPARTMENT OF INSURANCE**

**DATE & TIME:**  10/11/2017 12:10:00 PM
**PLACE:**  2910 N. 44TH ST., STE. 210
                 **PHOENIX, AZ 85018**     **Business**
**MANNER:**  By leaving true copies of the above documents with
                 **ELIZABETH VILLALINO**    **Authorized to Accept Service**

I declare under penalty of perjury that the foregoing is true.

Statement of Costs

| | | |
|---|---|---|
| Service Fee | $16.00 | |
| Document Prep Fee | $10.00 | |
| Mileage (8) | $19.20 | |
| Fee paid to ADOI | $15.00 | |
| Fee Advance | $1.50 | |
| | | |
| Total | $61.70 | |

Brett Long
Process Server registered in Maricopa County

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
A. Driver, Deputy
10/24/2017 11:50:00 AM
Filing ID 8778997

Christopher A. LaVoy (016609)

**TB** **TIFFANY & BOSCO**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-4237
TELEPHONE: (602) 255-6000
FACSIMILE:  (602) 255-0103
E-MAIL: cal@tblaw.com
*Attorneys for plaintiff*

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

| | |
|---|---|
| MPB Collection, LLC, | Case No.:  CV2017-013705 |
| Plaintiff, | **NOTICE OF FILING AMENDED CIVIL COVER SHEET** |
| v. | |
| Everest National Insurance Company, | |
| Defendant. | |

Plaintiff MPB Collection, LLC ("MPB") hereby gives notice of filing the attached amended civil cover sheet. MPB inadvertently used a previous version of the civil cover sheet that did not contain the option to designate a case as eligible for the commercial court. The attached cover sheet is amended to show such designation. All other information remains the same as the previously filed cover sheet.

DATED this 24th day of October, 2017.

TIFFANY & BOSCO, P.A.

By:   /s/Christopher A. LaVoy
Christopher A. LaVoy
Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016
*Attorneys for plaintiff*

1

**In the Superior Court of the State of Arizona**
**In and For the County of** Maricopa

Case Number CV2017-013705

**CIVIL COVER SHEET- NEW FILING ONLY**
(Please Type or Print)

Plaintiff's Attorney Christopher A. LaVoy

Attorney Bar Number 016609

**Is Interpreter Needed?** ☐ Yes ☒ No
**If yes, what language:**

| Plaintiff's Name(s): (List all) | Plaintiff's Address: | Phone #: | Email Address: |
|---|---|---|---|
| MPB Collection, LLC | Tiffany & Bosco, PA | (602) 255-6000 | cal@tblaw.com |
| | 2525 E. Camelback Rd., 7th Fl. | | |
| | Phoenix, AZ 85016 | | |

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)   Everest National Insurance Company

(List additional defendants on page two and/or attach a separate sheet)

EMERGENCY ORDER SOUGHT: ☐ Temporary Restraining Order   ☐ Provisional Remedy   ☐ OSC

☐ Election Challenge   ☐ Employer Sanction   ☐ Other _____
(Specify)

☐ RULE 8(h) COMPLEX LITIGATION APPLIES. Rule 8(h) of the Rules of Civil Procedure defines a "Complex Case" as civil actions that require continuous judicial management. A typical case involves a large number of witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties.

(Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category.)

☒ THIS CASE IS ELIGIBLE FOR THE COMMERCIAL COURT UNDER EXPERIMENTAL RULE 8.1. (Maricopa County only.) Rule 8.1 defines a commercial case and establishes eligibility criteria for the commercial court. Generally, a commercial case primarily involves issues arising from a business contract or business transaction. However, consumer transactions are not eligible. A consumer transaction is one that is primarily for personal, family or household purposes. **Please review Rule 8.1 for a complete list of the criteria.** See http://www.superiorcourt.maricopa.gov/commercial-court/. You must check this box if this is an eligible commercial case. **In addition, mark the appropriate box below in the "Nature of Action" case category.** The words "commercial court assignment requested" must appear in the caption of the original complaint.

## NATURE OF ACTION

(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**

☐ 101 Non-Death/Personal Injury
☐ 102 Property Damage
☐ 103 Wrongful Death

**110 TORT NON-MOTOR VEHICLE:**

☐ 111 Negligence
☐ 112 Product Liability – Asbestos
☐ 112 Product Liability – Tobacco
☐ 112 Product Liability – Toxic/Other
☐ 113 Intentional Tort

☐ 114 Property Damage
☐ 115 Legal Malpractice
☐ 115 Malpractice – Other professional
☐ 117 Premises Liability
☐ 118 Slander/Libel/Defamation
☐ 116 Other (Specify) _____

**120 MEDICAL MALPRACTICE:**

☐ 121 Physician M.D.   ☐ 123 Hospital
☐ 122 Physician D.O   ☐ 124 Other

Case No. CV2017-013705

**130 CONTRACTS:**

- ☐ 131 Account (Open or Stated)
- ☐ 132 Promissory Note
- ☐ 133 Foreclosure
- ☐ 138 Buyer-Plaintiff
- ☐ 139 Fraud
- ☒ 134 Other Contract (i.e. Breach of Contract)
- ☐ 135 Excess Proceeds-Sale
- ☐ Construction Defects (Residential/Commercial)
  - ☐ 136 Six to Nineteen Structures
  - ☐ 137 Twenty or More Structures

**150-199 OTHER CIVIL CASE TYPES:**

- ☐ 156 Eminent Domain/Condemnation
- ☐ 151 Eviction Actions (Forcible and Special Detainers)
- ☐ 152 Change of Name
- ☐ 153 Transcript of Judgment
- ☐ 154 Foreign Judgment
- ☐ 158 Quiet Title
- ☐ 160 Forfeiture
- ☐ 175 Election Challenge
- ☐ 179 NCC-Employer Sanction Action
  - (A.R.S. §23-212)
- ☐ 180 Injunction against Workplace Harassment
- ☐ 181 Injunction against Harassment
- ☐ 182 Civil Penalty
- ☐ 186 Water Rights (Not General Stream Adjudication)
- ☐ 187 Real Property
- ☐ Special Action against Lower Courts
  - (See lower court appeal cover sheet in Maricopa)

- ☐ 194 Immigration Enforcement Challenge
  - (§§1-501, 1-502, 11-1051)

**150-199 UNCLASSIFIED CIVIL:**

- ☐ Administrative Review
  - (See lower court appeal cover sheet in Maricopa)
- ☐ 150 Tax Appeal
  - (All other tax matters must be filed in the AZ Tax Court)
- ☐ 155 Declaratory Judgment
- ☐ 157 Habeas Corpus
- ☐ 184 Landlord Tenant Dispute- Other
- ☐ 190 Declaration of Factual Innocence
  - (A.R.S. §12-771)
- ☐ 191 Declaration of Factual Improper Party Status
- ☐ 193 Vulnerable Adult (A.R.S. §46-451)
- ☐ 165 Tribal Judgment
- ☐ 167 Structured Settlement (A.R.S. §12-2901)
- ☐ 169 Attorney Conservatorships (State Bar)
- ☐ 170 Unauthorized Practice of Law (State Bar)
- ☐ 171 Out-of-State Deposition for Foreign Jurisdiction
- ☐ 172 Secure Attendance of Prisoner
- ☐ 173 Assurance of Discontinuance
- ☐ 174 In-State Deposition for Foreign Jurisdiction
- ☐ 176 Eminent Domain– Light Rail Only
- ☐ 177 Interpleader– Automobile Only
- ☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
- ☐ 183 Employment Dispute- Discrimination
- ☐ 185 Employment Dispute-Other
- ☐ 195(a) Amendment of Marriage License
- ☐ 195(b) Amendment of Birth Certificate
- ☐ 163 Other _____
  - (Specify)

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

- ☐ Antitrust/Trade Regulation
- ☐ Construction Defect with many parties or structures
- ☐ Mass Tort
- ☐ Securities Litigation with many parties
- ☐ Environmental Toxic Tort with many parties
- ☐ Class Action Claims
- ☐ Insurance Coverage Claims arising from the above-listed case types
- ☐ A Complex Case as defined by Rule 8(h) ARCP

**Additional Plaintiff(s)**

_____

_____

**Additional Defendant(s)**

_____

_____