**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| MBP Collection LLC, | No. CV-17-04022-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Everest National Insurance Company, | |
| Defendant. | |

Pending before the Court are Plaintiff MBP Collection, LLC's Motion for Partial Summary Judgment (Doc. 16), and Defendant Everest National Insurance Company's Motion for Summary Judgment (Doc. 17). For the following reasons, the Court will grant MBP's Motion for Partial Summary Judgment.

## BACKGROUND

In 2012, MBP Collection LLC ("Metro Bank") loaned 3.6 million dollars to Global Medical Equipment of America, Inc. ("Global Medical"). (Doc. 18, ¶ 13). Global Medical obtained this loan to purchase two other medical equipment companies—JCare Medical and A&A Medical—and to pay off an existing loan with a different bank. (Doc. 18, ¶ 8). Because the loan amount did not cover the entire purchase price of the two other medical equipment companies, Metro Bank required that Global Medical would not make any additional payments to other creditors during the first four years of the repayment plan. (Doc. 18, ¶ 21).

At the time, Metro Bank thought it had also obtained Standby Creditor's Agreements ("SC Agreements") from Michael Trahktman, who was selling A&A Medical

Stock, and Debra Sloan, who was selling the JCare Medical stock. (*See* Doc. 18, Exs. 5, 6). These two agreements required Michael Trahktman and Debra Sloan ("the creditors") to refuse any payments from Global Medical during the first four years of the loan repayment period. (Doc. 18, ¶ 23). Notably, the agreements required the creditors to pay to Metro Bank any payments made from Global Medical to the creditors during this four-year period. (Doc. 18, ¶ 24).

Between 2013 and 2017, Everest National Insurance Company ("Everest") issued Metro Bank two financial institution bonds: one for 2013-2014 ("2013-2014 Bond", and one for 2014-2017 ("the Bond"). (*See* Doc. 18, Exs. 1, 2). Insurance Agreement (E) of the Bond provides coverage for a "Loss resulting directly from [Metro Bank] having, in good faith, for its own account or for the account of others, . . . acquired sold or delivered or given value, extended credit or assumed liability on the faith of, any Written, Original . . . personal Guarantee. . . or Security Agreement." (*See* Doc. 18, Ex. 1 at 7, Ex. 2 at 5). Under the Bond, a "Guarantee" is defined as a "[w]ritten undertaking obligating the signer to pay the debt of another, to the Insured . . . if the debt is not paid in accordance with its terms." (*See* Doc. 18 Ex. 1 at 12, Ex. 2 at 10). A "Security Agreement" is defined as a "[w]ritten agreement which creates an interest in personal property or fixtures and which secures payment or performance of an obligation." (*Id.*). Both bonds specifically apply to losses that are first discovered during the Bond period. (Doc. 18, Ex. 2, at 14). The bonds further require that Metro Bank notify Everest of any discovered loss within thirty days, and to provide proof of the loss within six months. (Doc. 18, ¶ 31).

In 2014, Metro Bank exercised its right of receivership under the loan agreement with Global Medical. After the receivership was in place, Metro Bank discovered that Global Medical had not been truthful in its loan application. (Doc. 18, ¶ 16). In addition to misrepresenting the selling prices of A&A Medical and JCare, Metro Bank also discovered that the SC Agreements with the creditors were forged. (Doc. 18 ¶ 14).

In March 2016, Metro Bank notified Everest of a claim resulting from the forged SC Agreements. And then, in April, Metro Bank provided Everest with proof of loss,

1  which requested that Everest consider the claim under both the 2013-2014 Bond and the
2014-2017 Bond. (Doc. 18 ¶ 19).

There are two issues in this order: (1) whether the SC Agreements are covered by the Bond as either a "security" or a "guarantee", and if so, (2) whether the notice-prejudice rule applies to the Bond.

**DISCUSSION**

**I.     The SC Agreements are "Guarantees" Under the Terms of the Bond**

In Arizona, "[p]rovisions of insurance policies are to be construed in a manner according to their plain and ordinary meaning." *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 534 647 P.2d 1127, 1132 (1982). Under the Bond, Metro Bank was insured for forged guarantees. (Doc. 18, Ex. 2 at 5). A "Guarantee" is defined as a "[w]ritten undertaking obligating the signer to pay the debt of another, to the Insured . . . if the debt is not paid in accordance with its terms." (Doc. 18, Ex. 1, at 7).

The Loan Agreement required Global Medical to forgo any payments to the creditors during the first four years of the loan repayment period. (Doc. 18, ¶ 21). If Global Medical made payments to the creditors during this four-year period, that would plainly violate the terms of the debt agreement. And in that event, under the SC Agreements, the creditors would be *obligated* to pay to Metro Bank any such funds the creditors received from Global Medical that did not exceed the amount that Global Medical owed Metro Bank. Because the purported agreements between the bank and the creditors obligated them to pay to the bank any amounts paid to the creditors by Global Medical that violated the terms of its agreement with MBP, those SC Agreements meet the terms of a "Guarantee" under the Bond.[1] Notably, a guarantee agreement does not have to create an

---

[1] Everest argues that the definition of a Guarantee limits coverage to instances where there is a monetary default—i.e. when the debtor does not actually *pay* the debt in accordance with its terms. (Doc. 20 at 5). Everest then argues that any payments Global Medical made to the creditors would be considered a non-monetary default, it is not covered as a Guarantee under the Bond. For the reasons described above, the SC Agreements are covered under the plain language of the Bond. But to the extent that there could be multiple interpretations of the language of the Bond—one where non-monetary guarantees are covered, and one where they are not—that ambiguity must be construed against Everest under Arizona law. *See Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz.

- 3 -

obligation to pay the entire debt. *See Tenet Healthsystem Inc. v. Silver*, 203 Ariz. 217, 219, 52 P.3d 786, 788 (App. 2002) ("The nature and extent of a guarantor's liability depends upon the terms of the guaranty contract.").

Everest cites to case law from courts outside this Circuit to argue that the SC Agreements are not guarantees. Those cases are simply not persuasive.[2]

## II. The Notice-Prejudice Rule Applies to the Bond

In Arizona, insurance policies generally fall into two categories: claims-made policies, and occurrence policies. "An occurrence policy of professional liability insurance covers an act or omission that occurs within the policy period, regardless of the date of discovery or the date the claim is made or asserted." *Thoracic Cardiovascular Assocs. v. St. Paul Fire & Marine Ins. Co.*, 181 Ariz. 449 452, 891 P.2d 916, 919 (Ct. App. 1994). On the other hand, "transmittal of the notice of the claim to the insurer is the most important aspect of the claims made policy." *Id.* at 453. Notifying the insurer of the claim "triggers coverage," and therefore "the essence. . . of a claims-made policy is *notice to the carrier within the policy period*." *Id.* (emphasis in original).

For most insurance policies, "an insurance company is not relieved of its contractual liability because of the insured's failure to give notice unless it can show that it has been prejudiced thereby." *Lindus v. N. Ins. Co.*, 103 Ariz. 60, 164, 438 P.2d 311, 315 (1968). However, for claims-made policies, the notice-prejudice rule does not apply, because applying it would be "tantamount to an extension of coverage," which would "in effect, rewrite[] the contract between the two parties." *Sletten v. St. Paul Fire and Marine Ins. Co.*, 161 Ariz. 595, 597 780 P.2d 428, 430 (Az. Ct. App. 1989). The effect of this extension, "would be to convert claims-made policies into occurrence policies. In the

---

529, 534 647 P.2d 1127, 1132 (1982).

[2] One case that Everest cites is an unpublished opinion that applies a state law test not applicable here. *Alerus Fin. Nat'l Ass'n v. St. Paul Mercury Ins. Co.* 27-cv-09-3344 (Minn. Dist. 2010). The other case Everest cites, *Jefferson Bank v. Progressive Casualty Insurance Co.*, 1990 WL 180585 (E.D. Pa. 1990) was reversed by the Third Circuit. *See Jefferson Bank v. Progressive Cas. Ins. Co.*, 965 F.3d 1274 (3rd Cir. 1992).

absence of actual prejudice from late reporting, which also defeats coverage under an occurrence policy, all negligence during the policy period would be covered." *Id*.

Metro Bank concedes that if a trier of fact concludes that the loss was first discovered within the 2013-2014 Bond period, there would be no coverage, because the Bond unambiguously terminates coverage for any losses discovered during the 2013-2014 Bond, at the end of that policy period. (Doc. 16 at 9) (Doc. 18 Ex. 2 at 2). The only issue is whether the notice-prejudice rule applies to the Bond where notice was potentially given within the Bond period, but not within the 30 days that the Bond prescribes.

The Bond is not an occurrence policy, because it does not provide coverage for any fraudulent act or omission that occurs during the policy period. But it is not a claims-made policy either, because coverage is not triggered by notifying Everest of the loss. Rather, coverage under the Bond "applies to loss *first discovered* during the policy period," not to a loss first reported to Everest during the policy period. (Doc. 18, Ex. 2 at 14) (emphasis added). Because discovery triggers the coverage of the Bond to the loss, the rationale for not extending the notice-prejudice rule to claims-made policies does not apply in this context. Unlike claims-made policies, the application of the notice-prejudice rule here would not have the effect of converting the policy to an occurrence policy. *See Sletten*, 161 Ariz. at 597. Instead, it merely requires that Everest provide coverage to claims that are discovered and reported within the policy period if it has not been prejudiced by a late notice. *See 11333 Inc. v. Certain Underwriters at Lloyd's, London*, 2015 WL 1578501 at *6-7 (D. Ariz. 2015) (holding that the notice-prejudice rule applies to an insurance policy where discovery triggers coverage).

**IT IS THEREFORE ORDERED** that MBP Collection, LLC's Motion for Partial Summary Judgment (Doc. 16) is **GRANTED**.

**IT IS FURTHER ORDERED** that Everest National Insurance Company's Motion for Summary Judgment (Doc. 17) is **DENIED**.

Dated this 3rd day of January, 2019.

G. Murray Snow
Chief United States District Judge