**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MPB Collection LLC, | No. CV-17-04022-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Everest National Insurance Company, | |
| Defendant. | |

Pending before the Court are Defendant Everest National Insurance Company ("Everest")'s Motion for Summary Judgment (Doc. 39) and Plaintiff MPB Collection, LLC ("MPB")'s Motion for Summary Judgment (Doc. 41). MPB's Motion is granted and Everest's Motion is denied.[1]

## BACKGROUND

In 2012, MPB loaned 3.6 million dollars to Global Medical Equipment of America, Inc. ("GMEA"). GMEA obtained this loan to purchase two other medical equipment companies—JCare Medical and A&A Medical—and to pay off an existing loan with a different bank. Because GMEA was taking out a small additional loan from the owners of both acquired companies to fund the purchase, MPB required that GMEA would not make payments to creditors other than MPB during the first four years of the repayment plan. At the time, MPB thought GMEA had submitted valid Standby Creditor's Agreements ("SC

---

[1] Both parties have requested oral argument. Those requests are denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

Agreements") from Michael Trahktman, who was selling A&A Medical stock, and Debra Sloan, who was selling JCare Medical stock. These two agreements required Trahktman and Sloan ("the creditors") to refuse any payments from GMEA during the first four years of the loan repayment period. The agreements further required the creditors to pay MPB any payments made from GMEA to the creditors during this four-year period.

Between 2013 and 2017, Everest issued MPB two financial institution bonds: one for 2013-2014 ("2013-2014 Bond") and one for 2014-2017 ("the Bond"). Insuring Agreement (E) of the Bond provides coverage for a "Loss resulting directly from [MPB] having, in good faith, for its own account or for the account of others, . . . acquired sold or delivered or given value, extended credit or assumed liability on the faith of, any Written, Original . . . personal Guarantee. . . or Security Agreement . . . which (i) bears a handwritten signature which is material to the validity or enforceability of the security, which is a Forgery." (Doc. 18, Ex. 1 at 7, Ex. 2 at 5.)

In 2014, MPB exercised its right of receivership under the loan agreement with GMEA. After the receivership was in place, MPB discovered that GMEA had not been truthful in its loan application. In addition to misrepresenting the selling prices of A&A Medical and JCare, GMEA had forged the SC Agreements with the creditors. Furthermore, in contravention of the two SC Agreements, GMEA purportedly made payments to both Trahktman and Sloan. Specifically, GMEA paid Trahktman $178,225.95 and Sloan $22,000. In what appeared to be a violation of the SC Agreement, neither Trahktman nor Sloan remitted these payments to MPB.

In March 2016, MPB notified Everest of a claim resulting from the forged SC Agreements. In April 2016, MPB provided Everest with proof of loss and requested that Everest consider the claim under both the 2013-2014 Bond and the 2014-2017 Bond. Everest denied coverage for the SC Agreements. Consequently, MPB filed this suit in Maricopa County Superior Court on October 10, 2017 alleging breach of contract and seeking to recover the total amount of the loan that GMEA never repaid under Insuring Agreement (E). Everest removed to this Court on October 31, 2017. On April 20, 2018,

MPB filed a motion for partial summary judgment and Everest filed a motion for summary judgment. After determining that the two SC Agreements constituted "guaranties" as defined by the Bond, the Court granted MPB's motion and denied Everest's motion. On July 3, 2019, having stipulated regarding the issues left for summary judgment, Everest and MPB cross filed these motions for summary judgment. The remaining issue before the Court is whether the causation requirement embodied in the "loss resulting directly from" language in Insuring Agreement (E) is satisfied with respect to the forged SC Agreements.[2]

## DISCUSSION

**I.     Analysis**

    **A.     Satisfaction of the Direct Loss Requirement**

According to the plain language of Insuring Agreement (E), a covered loss must be the direct result of credit extended on the faith of a guarantee which "bears a handwritten signature . . . which is a forgery." (Doc. 18-1 at 7, 18-2 at 5.) Thus, according to the plain meaning of the Bond, the "loss resulting directly from" language refers to loss directly caused by the extension of credit—in this case, MPB's loan to GMEA. There is nothing in the language of the Bond that suggests that loss directly caused by the loan which resulted from the forgery is limited by the purported value of the forged instrument, or by other factors that might have caused the loan to be valueless. Where the language of an insurance policy is clear, the Court must "afford it its plain and ordinary meaning and apply it as written." *Liberty Ins. Underwriters, Inc. v. Weitz Co.*, LLC, 215 Ariz. 80, 83, 158 P.3d 209, 212 (Ct. App. 2007).

Everest argues that MPB's loss did not "result directly" from the forged SC Agreement, but rather from the many other misrepresentations made to MBP by GMEA so that GMEA could obtain the loan that both violated the understandings on which the loan was issued and impaired the likelihood that GMEA could meet its obligations under the

---

[2] The stipulation also noted that the parties were actively negotiating resolution of a second issue: "(2) Whether Everest is entitled to offset any covered loss by the amount of the Bank's settlement with Starfield & Smith, P.C. related to this matter and, if so, in what amount." (Doc. 36 at 1.) The parties later reached a consensus that an offset for the settlement amount was not appropriate, leaving only the first issue for resolution in this proceeding.

loan.[3] This argument is misplaced because the issue raised by the language of the Bond is whether the loss was directly caused by the loan, not whether the loan may have lacked value for reasons in addition to the forged SC agreements. The parties point to no language in the Bond that suggests these coverage provisions become inoperative if there were other instances of fraud in the loan procurement that, if known, would have prevented the loan and the loss that resulted directly therefrom.

In this case the parties have stipulated to facts that demonstrate that the loan was extended "on the faith of, a[] Written, Original . . . personal Guarantee . . . which (i) bears a handwritten signature which is material to the validity or enforceability of the security, which is a Forgery." (Doc. 18-1 at 7, 18-2 at 5.)

The parties stipulated that:

> The Bank would not have made the Loan without an SBA guarantee. The SBA guarantee was conditioned on, among other things, Trahktman and Sloan each signing a Standby-Creditor's Agreement. The Bank would not have proceeded without these documents.

(Doc. 40 at 4.) Thus, the parties have stipulated to material facts that establish that the Bank issued the loan "on the faith of" the SC agreements. Everest offers no facts to contest this.

### B. Recovery Amount

Everest argues that even if GMEA's forgery on the SC Agreements was the direct cause of some portion of MPB's loss, MPB is only entitled to recover $200,225, the amount it would have received from the creditors had the SC Agreements been enforceable. But this argument too misapprehends the relevant language of the Bond. The covered loss is that loss which directly results "from [MPB] having, in good faith, . . . given value, [or] extended credit on the faith of, any Written, Original . . . personal Guarantee. . . or Security

---

[3] Specifically, MPB learned after completing the loan: that GMEA misrepresented the actual purchase prices for JCare Medical and A&A Medical to pocket the excess funds; that GMEA's President and CEO, Harold Halman, had an approximate 40% ownership interest in GMEA and had not provided a personal guarantee; that GMEA had not actually contributed its own funds to the purchase of JCare and A&A; that the SBA's required equity injection of $600,000 never occurred; and that there were multiple lawsuits pending against GMEA at the time it took out the loan, which would have disqualified GMEA from obtaining the SBA loan.

Agreement . . . which (i) bears a handwritten signature which is material to the validity or enforceability of the security, which is a Forgery." (Doc. 18-1 at 7, 18-2 at 5.) There is nothing in the Bond language that limits the loss to the amount of the forged security on faith of which the loan was completed. Nor do the parties contest the amount of the loss that directly resulted from the loan. They have stipulated that "[a]t this time, the outstanding principal balance on the Loan is $811,589.49." (Doc. 40 at 6.)

It is true that the SC Agreements are limited; rather than an "absolute[] and unconditional[] guarantee" for "the payment and performance of each and every debt, of every type and description, that the borrower may now or at any time in the future owe," *Beach Cmty. Bank v. St. Paul Mercury Ins. Co.*, 635 F.3d 1190, 1192–93 (11th Cir. 2011), the SC Agreements provided only that the creditors would not accept payments on GMEA's debt to them until after June 29, 2016, and that the creditors would turn over any payments received from GMEA in violation of the Agreement. But the loss covered by the Bond is not simply the "loss resulting directly from a forged guaranty," (Doc. 42 at 4)— it is the "loss resulting directly from . . . extending credit . . . on the faith of" the forged guaranty, (Doc. 40 at 5). As the Seventh Circuit noted, in the context of a determining coverage under a financial institution bond, "our task is to interpret the parties' agreement" by looking to the agreement's plain language. *First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 568, 570 (7th Cir. 2009). The parties have stipulated that the "[b]ank would not have made the loan without an SBA guarantee. The SBA guarantee was conditioned on, among other things, Trahktman and Sloan each signing a Standby-Creditor's Agreement. The Bank would not have proceeded without these documents." (Doc. 40 at 4). The parties have further stipulated that the damage resulting from the extension of the loan to GMEA is $811,589.49. As in *First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*, this loss "easily fit[s] within th[e] coverage language" of Insuring Agreement (E); to hold otherwise would be to "ignore[] the plain language of Insuring Agreement E." 485 F.3d 971, 980 (7th Cir. 2007) (dismissing as "unpersuasive" the rationale that a bond did not cover losses resulting from the nonexistence of assets assigned

by a forged instrument because "[e]ven if the signature on the confirmation was authentic, the bank would have suffered the loss"). Thus, the amount of the "loss resulting directly from" MPB "extending credit . . . on the faith of" the forged Standby-Creditor's Agreement is $811,589.49, and this is the amount MPB should recover.

## CONCLUSION

The Bond covers loss resulting directly from MPB's extension of credit based on forged guarantees. MPB's funds were directly depleted by GMEA's forgery because MPB would not have made the loan to GMEA without an SBA guarantee conditioned on a valid SC Agreement. Thus, MPB must be awarded the outstanding balance of the loan, $811,589.49.

**IT IS THEREFORE ORDERED** that MPB's Motion for Summary Judgment (Doc. 41) is **GRANTED** and Everest's Motion for Summary Judgment (Doc. 39) is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to terminate this case and enter judgment accordingly.

Dated this 6th day of November, 2019.

_G. Murray Snow_
G. Murray Snow
Chief United States District Judge